Commonwealth *v.* Fredericks, Appellant.

Submitted March 17, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Margaret H. Poswistilo,* Assistant Public Defender, for appellant.

*Alan B. McFall,* Assistant District Attorney, and *Charles H. Spaziani,* District Attorney, for Commonwealth, appellee.

OPINION BY CERCONE, J., June 24, 1975:

The instant appeal arises from appellant's conviction after his second jury trial of burglary and larceny, his first trial having resulted in a mistrial for failure of the jurors to agree. Appellant raises numerous allegations of error which we shall treat seriatim after setting forth the facts.

In the wee hours of March 26, 1972, Assistant Chief Krome was on patrol in Forks Township when he ap-

proached the Manufacturer's Discount House on Route 115 and observed a vehicle parked in the parking lot. The officer passed the store, but proceeded only a few hundred feet before deciding to investigate. As he again approached the parking lot, the car's headlights went on as it proceeded out of the lot and passed him going in the opposite direction. Officer Krome turned around, took the license plate number, model and color of the vehicle and noted approximately three persons in the car.

Two and one-half hours later, Officer Krome returned to the store and checked the front door. He then noticed a rock and broken glass lying on the floor inside the building. He walked to the rear of the premises where he saw a broken window and clothing strewn on the ground. There was broken glass both inside and outside the building, including pieces from which fingerprints were taken. The owners of the store confirmed that various items of clothing were missing.

Subsequent investigation revealed that the car which Officer Krome had observed belonged to appellant who, in connection with another arrest, had been fingerprinted by the Easton police. Officer Krome requested appellant's fingerprint card from the Easton police and forwarded it to the State Police for comparison with fingerprints lifted from the broken glass found at the scene. The prints matched.

In August Officer Krome interviewed appellant concerning his whereabouts when the burglary occurred. Appellant stated that he had loaned his car to two friends of his and was staying at another friend's house when the two returned with his car early in the morning. They told him that they had burglarized a store in Forks Township and that his car was loaded with clothing. According to appellant, he told them to remove the clothing, which they did, and then he drove his car home. Nevertheless, appellant was arrested on charges of burglary and larceny.

On April 10-11 of 1973 appellant was tried before a jury. At noon on April 11, the jury retired to deliberate. At 2:40 P.M. and 3:45 P.M. the jury returned to the courtroom for special instructions. At 4:25 the jury returned and informed the court that it was unable to reach a verdict. The instant discussion ensued:

"THE COURT: All right, I will have the foreman stand on behalf of the jury and report to the Court what your decision is with respect to being able to arrive at a unanimous verdict. Not any numbers or anything, but just whether you are able to arrive at a unanimous verdict.

THE FOREMAN: We have not arrived at a unanimous verdict.

THE COURT: Do you feel that there would be anything to be gained by sending you back for further deliberations or are you deadlocked to the point where you feel no progress could be made?

THE FOREMAN: I feel that no progress could be made by anymore deliberations.

THE COURT: All right, I will accept your statement, and on the basis of it I hereby declare that a mistrial has occurred in this proceeding by reason of the inability of the jury to arrive at a unanimous verdict.

By making that declaration that I have from the bench, that ends this particular trial. You will have absolutely no further responsibility in this case, and you will be returning to jury service tomorrow morning to the panel as a whole and then it remains whether you will be called for other cases. You are excused."

Appellant recorded no objection to the court's *sua sponte* declaration of a mistrial.

New counsel was appointed for appellant and, on February 27, 1974, a second trial was held on the same charges, wherein the jury returned verdicts of guilty.

At no time prior to or during that trial did appellant protest that the proceeding constituted a violation of the Fifth Amendment's proscription that one may not twice be placed in jeopardy for the same offense.[1]

## DOUBLE JEOPARDY

Appellant's first contention, that the court's declaration of a mistrial at his first trial constituted a bar to his being tried again for those same offenses, requires an affirmative answer to each of the following questions before appellant may succeed on this appeal: (1) May appellant raise the bar of double jeopardy at his second trial when he did not object to the court's *sua sponte* declaration of a mistrial at his first trial; (2) May appellant raise the question of double jeopardy, directly or indirectly, on appeal when that question was not timely raised at the second trial in the court below; and, (3) Did the trial court abuse its discretion in finding that manifest necessity required the declaration of a mistrial at appellant's first trial.

A. *The necessity of a prompt objection at the first trial*

That this first question is one not readily answered becomes apparent at the initial stages of inquiry—there is a clearly discernible split in authority, even among the federal circuit courts,[2] on whether a defendant must object to the declaration of a mistrial in order to preserve a claim of double jeopardy in case of his subsequent prosecution for the same offense.[3]

---

1. The "double jeopardy" clause of the Fifth Amendment was made applicable to the states under the due process clause of the Fourteenth Amendment in *Benton v. Maryland*, 395 U.S. 784 (1969).

2. Compare *Himmelfarb v. United States*, 175 F. 2d 924 (9th Cir. 1949), cert. denied 388 U.S. 860, with *United States v. Phillips*, 431 F.2d 949 (3d Cir. 1970).

3. Cases indicative of this split in authority are collected in Annot., 63 A.L.R.2d § 5.

84

Authoritative case law in Pennsylvania is scant and, at least superficially, contradictory. The Supreme Court of this Commonwealth confronted this question under the double jeopardy clause of the state constitution in *Commonwealth v. Baker*, 413 Pa. 105 (1964).[4] Article I, §10 of the Constitution of this Commonwealth provides: "No person shall, for the same offense, be twice put in jeopardy of life or limb. . . ." That clause, for reasons more of historical than practical significance, had consistently been applied to bar a second prosecution only for offenses for which the defendant could potentially receive corporal or capital punishment; i.e., offenses which literally put defendants in jeopardy of life or limb.[5] Thus, in holding that the defendant's silence upon the trial court's *sua sponte* declaration of a mistrial did not waive his right to raise the double jeopardy bar at the subsequent trial for first degree murder, the Court placed considerable emphasis upon the fact that the Commonwealth could subsequently retry the defendant for second degree murder (a non-capital offense), and the fact that a human life should not be so readily forfeit as by silence under the taut circumstances of a capital case. In balancing those considerations, the Court felt that its decision comported more with sound public policy and necessity, and constituted a "reasonable interpretation of the criminal law." *Id.* at 111. See also *Commonwealth v. Simpson*, 310 Pa. at 388. The Court concluded:

"For these reasons we hold that the maxim that silence gives consent should not be applied to a situation as grave and a constitutional right as important as this. In other words, mere silence by defendant or his counsel to the proposed discharge of the jury by the trial Judge will not amount to a waiver of this very

---

4. *Baker* predated *Benton v. Maryland*, supra note 1, so that the double jeopardy clause of the federal Constitution was not then applicable to the states.

5. See, e.g., *Commonwealth v. Simpson*, 310 Pa. 380 (1933).

important constitutional right of every person accused of a capital offense." 413 Pa. at 115.

On the other hand *United States v. Phillips,* supra note 2, was a Third Circuit decision wherein silence at the declaration of a mistrial was held to preclude the defendant's raising the double jeopardy clause at his subsequent trial. In strong terms that court rejected the defendant-appellant's contention, stating:

"The purpose of an objection in this case would have been to challenge the judgment of the trial court that irreconcilable disagreement was present. Without an objection, we have before us only the actions of an experienced trial judge who heard all the evidence, knew the complexity or simplicity of the case, and decided further deliberation would be vain. To raise the issue now rather than at the trial is to leave the record so deficient as to make it impossible for us to say that the trial judge was incorrect." 431 F.2d at 950-951.

While we agree that a discussion on the record concerning the reasons which impel the trial court to declare a mistrial would be instructive to any subsequent trial or appellate court concerned with a double jeopardy question, we do not readily perceive why it is the defendant's burden to establish such a record. We so conclude for the following reasons:

First, it is not the declaration of a mistrial which offends appellant's rights, it is his subsequent prosecution for the same offense which runs afoul of the Fifth and Fourteenth Amendments. No defendant has a constitutional right to be acquitted by a jury, and no defendant can demand that his trial proceed to verdict if the Commonwealth wishes to discontinue the cause. It is inconsistent to require a defendant to object to the declaration of a mistrial when he has no right to demand that the charges proceed to verdict. Furthermore, it is well known that the Commonwealth, having once been stymied at

a jury trial, frequently will not reprosecute when a relatively minor felony is involved. If the Commonwealth may wish to make a second effort at a conviction, it is the Commonwealth which should insure that the court does not declare a mistrial unless manifest necessity requires it. For, it is the Commonwealth which in fact has lost the case if the court erroneously grants a mistrial.

Thus, we are in full agreement with the statement of one court that:

> "It would be a harsh rule to hold that defendant consented to a withdrawal of the case from the jury simply because he interposed no objection, which, possibly, he did not know he had a right to do. Besides, consent is active, while not objecting is merely passive. The old adage, 'Silence gives consent,' is not true in law; for there it only applies where there is some duty or obligation to speak. If it had appeared in the 'case,' as it does not, that the prisoner was asked whether he objected to the motion to withdraw the case from the jury, and he had said 'no,' or had even remained silent, then the result would have been different. As it was, however, we think it would be going too far to hold that he consented to a withdrawal of the case." *State v. Richardson*, 25 S.E. 220, 222 (S.C. 1896). [Citations deleted.] See also *Himmelfarb v. United States*, supra note 3; *Mitchell v. Superior Court*, 24 Cal. Rptr. 671 (1962).

B. *The necessity of raising the double jeopardy defense at the second trial*

The courts of Pennsylvania have consistently held that issues not timely raised in the court below are waived and may not be raised for the first time on appeal. *Commonwealth v. Agie*, 449 Pa. 187 (1972); *Commonwealth v. Henderson*, 441 Pa. 255 (1971). Even if we were to conclude that basic and fundamental error were involved, we could not *directly* consider appellant's double jeopardy claim because of his failure to raise it in the court below.

*Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974); *Commonwealth v. Reid,* 458 Pa. 357, 326 A.2d 267 (1974). However, a question not properly preserved for review in the court below may be indirectly reviewable if counsel's failure to preserve the question lacked any rational basis designed to effectuate his client's interests. *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599 (1967). See also *Commonwealth v. Twiggs,* 460 Pa. 105 (1975). And, if the record is adequate for the purpose, that question may be resolved without a hearing and on direct appeal. *Commonwealth v. Twiggs,* supra; *Commonwealth v. Dancer,* 460 Pa. 95 (1975).

In the instant case the record is adequate for our resolution of the claim of inadequacy of counsel. Appellate counsel, who represented appellant at his second trial, candidly admits that a "decision" not to raise a valid double jeopardy claim could have no possible basis designed to effectuate her client's interests. Indeed, she states that her failure to raise the claim at the second trial was sheer oversight, and the Commonwealth does not seriously dispute these contentions.[6] Having determined prima faciedly that counsel was inadequate if appellant's double jeopardy claim is valid, we must necessarily reach the merits of that claim.

C. *Did the court abuse its discretion in declaring a mistrial*

The landmark decision on whether a mistrial constitutes a bar to a subsequent prosecution for the same offense is *United States v. Perez,* 9 Wheat. (22 U.S.) 579, 580 (1824), and the following quotation therefrom is the prologue to virtually every discussion on the subject.

"We are of opinion, that [the declaration of a mistrial for failure of a jury to agree] constitutes no legal

---

6. Ordinarily, counsel should withdraw when a serious question of his adequacy appears, especially if the resolution of that question will likely require a hearing.

bar to a future trial. The prisoner has not been convicted or acquitted, and may again be put upon his defence. We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office."

At the same time, the trial court should resolve any doubts as to the "manifest necessity" of declaring a mistrial "in favor of the liberty of the citizen, rather than exercise what would be an unlimited, uncertain, and arbitrary judicial discretion." *Downum v. United States,* 372 U.S. 734, 738 (1963); *Commonwealth v. Ferguson,* 446 Pa. 24, 30 (1971).

The hung jury is frequently referred to as the "classic justification" for a mistrial.[7] Thus, where the jurors after full consideration of the case fail to agree, and there is no reasonable basis for believing that they will be able to agree after further deliberation, a manifest necessity

---

7. Y. Kamisar et al., Modern Criminal Procedure 1444 (4th ed. 1973).

exists for their discharge.[8] Under those circumstances the discharge of the jury does not operate as an acquittal or constitute a bar to subsequent prosecution for the same offense.[9] As the Supreme Court stated in *Wade v. Hunter,* 336 U.S. 684, 688-89 (1949):

> "The double-jeopardy provision of the Fifth Amendment, however, does not mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment. Such a rule would create an insuperable obstacle to the administration of justice in many cases in which there is no semblance of the type of oppressive practices at which the double-jeopardy prohibition is aimed. There may be unforeseeable circumstances that arise during a trial making its completion impossible, such as the failure of a jury to agree on a verdict.

> \* \* \*

> "It is settled that the duty of the judge in this event is to discharge the jury and direct a retrial. What has been said is enough to show that a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments."

However, if a jury is dismissed prematurely or for inadequate cause shown, the defendant may successfully maintain a double jeopardy objection. *Commonwealth v. Ferguson,* 446 Pa. 24 (1971); *Commonwealth ex rel. Montgomery v. Myers,* 422 Pa. 180 (1966).

In the instant case we must determine whether the trial court could have properly determined that the jury would not be able to reach a verdict so that "the ends of

---

8. See generally 22 C.J.S., Criminal Law §260 at p. 680, n. 56.

9. *Illinois v. Sommerville,* 410 U.S. 458 (1973).

public justice" or "manifest necessity" required the declaration of a mistrial. In this area the Supreme Court has eschewed the application of rigid rules in favor of flexible guidelines designed to reflect the broad and competing public policies involved in the trial court's decision.[10] *Illinois v. Sommerville*, 410 U.S. at 467. Indeed, should the trial court insist upon the jurors' further deliberation when it is clear that they have been unable to agree after full consideration of the case, and should the jury thereafter return a verdict of guilty, the defendant may successfully challenge the verdict on the grounds that it was coerced.[11]

With those guidelines in mind, we conclude that, on the facts of the instant case, the court did not abuse its discretion in ordering the jury discharged at appellant's first trial. To be sure, the question is a close one. Although the jury was only "out" from 12:00 P.M. to 4:25 P.M., and it is not disputed that some portion of that time was consumed for luncheon, other factors lead us to defer to the lower court's judgment.

First, the trial judge is always in a far better position than we to determine matters such as these. The judge below has heard the evidence, observed the attitude, demeanor and other characteristics of witnesses which bear on their credibility, and observed the jury's attentiveness and reaction to the evidence presented by both

---

10. As our Supreme Court stated in *Commonwealth ex rel. Montgomery v. Myers*, 422 Pa. at 192:

"Neither the interest of the accused nor the state would be served were we to make our trial courts 'unduly hesitant conscientiously to exercise their most sensitive judgment—according to their own lights in the immediate exigencies of trial—for the more effective protection of the. criminal accused.' *Gori v. United States*, [367 U.S.] at 369-70, 81 S. Ct. at 1527."

11. This dilemma underscores the value of the trial court's soliciting the defendant's preference in continuing with the jury empanelled, or discharging them for failure to agree. See *Commonwealth v. Stewart*, 456 Pa. 447 (1947).

sides. We can have little "feel" for those aspects of the trial which play so mightily in a decision such as a mistrial declaration from merely reading the cold record of the proceedings. As one court has stated, the very rarity of cases wherein a mistrial declaration has been held to bar subsequent prosecution "suggests how rarely the informed judgment of a trial court is disturbed in these or similar circumstances." *United States v. Goldstein,* 479 F.2d 1061, 1069 (2d Cir. 1973).

Second, the trial court below did not discharge the jury at the "first sign of disagreement." *Commonwealth v. Baker,* 413 Pa. at 115; *Commonwealth v. Brooks,* 225 Pa. Superior Ct. 247 at 250. The jury returned to the courtroom twice for special instructions before returning the last time to report their intractable disagreement.

Finally, the determination of guilt in this case rested almost exclusively on the question of appellant's credibility *vis a vis* the probity of the Commonwealth's circumstantial evidence. Obviously, an intransigence arose among the jury, and it was irreconcilably split on the question of whether appellant's testimony was credible to the point of raising at least a reasonable doubt in their minds. It was evident to the trial judge that further deliberation would not reveal some theretofore unnoticed nuance of the evidence which would lead the jurors to agreement. Hence, we are not disposed to disregard the statements of the foreman and to find that the court abused its discretion in declaring a mistrial.

SUPPRESSION OF EVIDENCE—FINGERPRINTS

Appellant's second contention rests upon the Commonwealth's using a sample of his fingerprints at trial in order to show that the fingerprints lifted from the broken glass found at the scene matched his. In particular appellant claims that the fingerprint sample used for comparison was inadmissible because it was the product of an illegal arrest. It seems that the Easton police,

suspecting appellant of having committed another and separate burglary, arrested him for that crime without probable cause and took his fingerprints. That case was "non prossed," but the Easton police retained his fingerprint card. It was that card which the Forks Township police requested and used for comparison, and was the basis of the incriminating testimony of the Commonwealth's expert at trial.

At the outset we note that the adoption of appellant's argument would place an intolerable burden on state and local law enforcement agencies to ascertain the source and constitutional propriety of information retained in their permanent files before using it in an investigation. Since, as in the instant case, it frequently happens that the police force which ultimately uses the information is not the police force which gathered it, the task would often be impossible.

Second, such a rule could have little or no deterrent effect on police conduct which invades the protections afforded by the Fourth Amendment. It is inconceivable that the police would avoid making an illegal arrest because the fingerprints taken incident to that arrest would not be available for use for identification in connection with subsequent, unrelated offenses. Since the deterrent effect of such a rule would be *de minimis,* the purposes of the exclusionary rule in Fourth Amendment cases would not be meaningfully served. *Mapp v. Ohio,* 367 U.S. 643 (1961). Furthermore, because of the minimal intrusion involved in fingerprinting and its tremendous value as a tool of investigation, the Supreme Court has indicated that the less stringent standards of *Terry v. Ohio,* 392 U.S. 1 (1968) may determine the basis upon which fingerprints of a suspect may be taken. See *Davis v. Mississippi,* 394 U.S. 721 (1969). Cf. *Camara v. Municipal Court,* 387 U.S. 523 (1967). Hence, the need for fingerprints will not often induce the police to carry out an illegal arrest.

Finally, our decision does not leave those in appellant's situation without a remedy. The clear weight of authority holds that one who has been falsely or illegally arrested is entitled to expungement of his record and removal of his fingerprints from criminal files. *Hughes v. Rizzo,* 282 F. Supp. 881 (E.D. Pa. 1968) ; *Menard v. Saxbe,* 498 F.2d 1017 (D.C. Cir. 1974).[12] In light of the other considerations noted above, we find that appellant's failure to make use of the remedy of expungement constitutes a waiver of his objection to the use of the information on file in other, unrelated investigations.

## THE COURT'S CHARGE TO THE JURY

Finally, appellant argues that the court's charge to the jury was erroneous in several respects, principally in omitting various points for charge suggested by appellant. For the reasons stated below, we reject appellant's contentions and find the court's charge to be correct in all these particulars.

First, appellant alleges that the court erred in refusing to charge that his mere presence at the scene of a crime is insufficient to sustain his conviction. However, the Commonwealth did not show merely that appellant was at the scene when the crime was committed, it also showed that his fingerprints were on the broken glass and that his car was used to haul off the loot. Hence, the evidence showed much more than appellant's mere presence at the scene of the crime and his requested point for charge was inapposite to the facts of this case.

Second, the appellant contends that the failure of the Commonwealth to call his alleged accomplices gave rise to the inference that their testimony would be unfavorable to the Commonwealth. The testimony of appellant's accomplices would either have placed him at the scene of

---

12. Numerous other cases are collected in Annot., 46 A.L.R. 3d 900 (1972).

the crime *or established his alibi.* The testimony of his accomplices, therefore, was potentially as helpful to appellant's case as it was to the Commonwealth's; and, given the equal availability of the witnesses to both parties, no negative inference should arise from the failure of either the Commonwealth or the appellant to call them. 2 Wigmore on Evidence §288 (3rd ed. 1940). See also *Green v. Green,* 182 Pa. Superior Ct. 287 (1956). In any event, it would appear that the negative inferences which could be drawn from the failure of either side to call these witnesses substantially off-set each other, rendering such an instruction more confusing than helpful. This is especially true because the adverse testimony of accomplices is notoriously unreliable. 2 Wigmore on Evidence §287 (3rd ed. 1940). As we have had occasion to previously state: "A trial judge should warn the jury of the corrupt source of an accomplice's testimony. . . ." *Commonwealth v. Cunningham,* 161 Pa. Superior Ct. 276, 277 (1947).

Finally, we find no error in the court's refusing to charge specifically that appellant was entitled to all favorable inferences arising from the evidence. The court's charge on this point was as follows:

"Circumstantial evidence may be used to prove any of the various elements necessary to sustain a criminal conviction, including the fact that a crime was committed and the identity of the criminal. A conviction may rest on circumstantial evidence alone, provided that the facts and circumstances are of such a nature to prove the appellant's guilt beyond a reasonable doubt. It is sufficient if the circumstances are consistent with guilt, even though they may also be consistent with innocence, but guilt must be proved **and** not conjectured and cannot rest solely on suspicion or surmise. The sufficiency of the evidence for conviction is measured by the same standard, irrespec-

tive of whether the evidence is direct or circumstantial or a combination of the two."

This charge was excerpted from S. Feldman, Pennsylvania Trial Guide §8.13 (1973), and we find it to be an accurate and sufficient statement of the law in Pennsylvania. See *Commonwealth v. Simpson,* 436 Pa. 459 (1970) ; *Commonwealth v. Kravitz,* 400 Pa. 198 (1960). We do not interpret *Commonwealth v. Roscioli,* 454 Pa. 59 (1974) as having altered these principles. *Roscioli* merely applied the long standing rule that guilt must be proved and not conjectured, to a very weak case of circumstantial evidence. The circumstantial proof in that case consisted of little other than appellant's presence at the scene of the crime, while the proof in the instant case is far more compelling.

For all the above-stated reasons, the judgments of sentence are affirmed.

JACOBS and PRICE, JJ., concur in the result.