373 A.2d 1055
**COMMONWEALTH of Pennsylvania**
v.
**Michael PETERS, Appellant.**

Supreme Court of Pennsylvania.

Argued April 7, 1975.

Decided June 3, 1977.

74

Victor S. Jaczun, Perkasie, Denis W. Lanctot, Morris-ville, for appellant.

Stephen B. Harris, First Asst. Dist. Atty., Doylestown, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

EAGEN, Chief Justice.

Michael Peters was convicted by a jury of aggravated assault and battery, assault and battery, conspiracy to commit assault and battery, conspiracy to commit aggravated assault and battery, and voluntary manslaughter. Following the denial of post-verdict motions by the court *en banc* of the Court of Common Pleas of Bucks County, judgment of sentence of not less than two nor more than five years was imposed on the manslaughter conviction. Judgments of sentence on the other convictions were suspended. This appeal followed.[1]

Peters complains: 1) that his right against being put twice in jeopardy was violated when he was retried and convicted following the *sua sponte* declaration of a mistrial; 2) that the trial court erred in refusing to suppress evidence of three statements given by Peters to prosecution officials and evidence of a "reenactment" of the killing provided by Peters; and, 3) that the trial court erred in giving what is commonly referred to as an "accomplice charge."

We need not reach the merits of Peters' first complaint because the issue is not properly preserved for review. Peters failed to plead double jeopardy prior to his second trial, and we now hold that such a failure constitutes a waiver of the issue under the circumstances presented.[2]

1. Peters did not appeal the convictions on which judgments of sentence were suspended.

2. While the Commonwealth relies heavily on a theory of waiver which we rejected in *Commonwealth v. Bartolomucci*, 468 Pa. 338, 362 A.2d 234 (1976), it also cites numerous examples of cases of pretrial waiver including *Commonwealth v. Abruzzese*, 231 Pa. Super. 157, 331 A.2d 821 (1974), which are in accord without ruling today. But in any event waiver in this context is a matter of proper judicial administration and, even if the Commonwealth did not argue pretrial waiver, we may raise the issue *sua sponte* in order to advance that interest.

While we have held no objection is necessary to preserve such an issue where a trial court declares a mistrial *sua sponte, Commonwealth v. Bartolomucci,* supra; accord *Commonwealth v. Fredericks,* 235 Pa.Super. 78, 340 A.2d 498 (1975); *Commonwealth v. Abruzzese,* supra, we created this exception to the ruling in *Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974) because " 'the *Perez [United States v. Perez,* 9 Wheat (22 U.S.) 579, 6 L.Ed. 165 (1824)] doctrine of manifest necessity stands as a *command* to trial judges not to' declare a mistrial absent manifest necessity." *Commonwealth v. Bartolomucci,* supra, 468 Pa. at 346, 362 A.2d at 238 quoting from *United States v. Jorn,* 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971). [Emphasis in original.] No similar consideration exists to excuse the failure to raise the issue prior to the commencement of the second trial. See, e. g., *Commonwealth v. Agie,* 449 Pa. 187, 296 A.2d 741 (1971); *Commonwealth v. Newsome,* 462 Pa. 106, 337 A.2d 904 (1975); *Commonwealth v. Clair,* supra. Furthermore, all of the considerations which justify a finding of waiver of other issues in a pretrial context are equally applicable to a double jeopardy claim. For example, by requiring the issue to be raised pretrial, trial courts will not have to waste time and energy conducting proceedings in which no conviction and judgment of sentence may be validly finalized.[3]

Accordingly, the issue is waived.

Peters next complains the trial court erred in failing to grant his motion to suppress and the court *en banc* erred in sustaining that ruling. The evidence which the court refused to suppress included three statements given by Peters to prosecution authorities and testimony recounting a reenactment by Peters of the events which occurred at the time of the killings.

---

3. Our ruling is in complete accord with *Commonwealth v. Bolden,* 472 Pa. 602, 373 A.2d 90 (1977), wherein we held that pretrial denial of relief on this basis is appealable.

■ In evaluating his complaint, we consider only the evidence presented by the Commonwealth and so much evidence for the defense, as fairly read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. Johnson*, 467 Pa. 146, 354 A.2d 886 (1976). Only one witness testified at the suppression hearing, namely John Rice, a detective with the District Attorney's office in Bucks County. His testimony established the following:

The body of Vincent Motto was found late in the day on July 24, 1969 at or near the water's edge of the Delaware River at a remote and deserted spot known as the "Cove" in Tullytown, Bucks County. An investigation ensued and authorities learned that Peters and other persons, including Motto, had been at Peters' apartment on July 22 or 23, 1969. The police proceeded to interview these persons. Each was requested to come to the Bristol Township Police Station to be interviewed. Peters, pursuant to the request, appeared there voluntarily on July 30, 1969. The police did not at that time suspect Peters was involved in Motto's death and he was free to leave the police station at any time he desired. No warnings of constitutional rights were given. The interview was recorded on tape. It was subsequently transcribed and was read into evidence at trial. This statement [hereinafter referred to as C-1] recounted in substance the following:

Peters and other persons met Motto at a bar in Bristol Township late in the day on July 22, 1969. Peters and his group left and went to Peters' apartment. Motto accompanied by another person thereafter arrived at the apartment, but both left after a short time. Motto returned alone a short time later with a gun which he "flashed . . . around." William Simmons requested the gun and Motto gave it to him. Simmons unloaded the gun and returned it to Motto. Motto reloaded it and again "flashed [it] around." Simmons requested that

Motto leave. Motto left escorted by Simmons, and Peters followed them to the doorway where he stood and watched Motto go to the parking lot area to a "broken down" car. Peters and Simmons then returned to the apartment. Later in the evening or in the early morning hours of July 23, 1969, Peters went to Motto's apartment and knocked on the door some five times in order to get beer, but Motto did not answer.

After this interview, Peters left the police station. The police investigation continued. Peters was interviewed by the police for the second time on March 8, 1971. This interview was prompted by information received by the police (on or about the same date) from one Frank Sullivan [4] that Peters had information concerning Motto's death.

The circumstances of this interview were as follows: The police phoned Peters and requested him to come to the courthouse. When Peters arrived he spoke with a receptionist who called Rice. Rice spoke with Peters in the hallway and informed him that Sullivan was attempting to obtain his release from prison on reduced bail and to help accomplish this, he had informed Rice that Peters had information about Motto's death. Rice then told Peters that the information received from Sullivan was why he wished to speak with him. Rice also said to Peters that *"The most that would happen to him* would be that he would be picked up or held as a material witness on dollar bail." [5] [Emphasis added.] Rice could not re-

---

4. Sullivan was in jail on unrelated charges at the time.

5. The relevant testimony is as follows:
   By Defense Counsel:
   "Q. Then, didn't you also tell Peters on March 8th that the most that would happen to him would be that he would be picked up or held as a material witness on dollar bail?
   "A. On March 8th?
   "Q. Yes.
   "A. After discussing it, I believe I did tell him this, yes.
   "Q. And prior to the . . . statement, is that correct?
   "A. I don't recall whether it was prior or after, but I believe I did mention it to him on March 8th."

call whether this remark was made prior to or subsequent to the interview of March 8, 1971, but since the Commonwealth has the burden of proof, we will assume the remark was made prior to the interview.

Peters and Rice went into an office where Ward Clark, the District Attorney, John McHugh, a court stenographer, and a state trooper were present. Clark conducted the interview which was transcribed. Peters was warned of his constitutional rights before the questioning began. Peters indicated he understood and was willing to answer questions. Immediately following the interview Peters was placed under arrest as a material witness and then released on nominal bail.[6]

The interview began at 5:15 p. m. and from it a second statement [hereinafter: C–2], which was in the form of

6. The record is not precise with regard to whether Peters was arrested as a material witness on March 8th. During direct examination, the following occurred:
   "Q. [Referring to March 8, 1971.] And at the end of the questioning, was he free to go home?
   "A. Yes.
   "Q. And did he, in fact, leave?
   "A. Yes, he did.
   "Q. And at no time while the statement was being taken or on this day, was he placed under arrest?
   "A. No, he was not."
   During cross-examination, the following occurred:
   "Q. Now, following the statement [of] March 8th, was Mr. Peters arrested as a material witness?
   "A. I believe he was. I believe so. I am not sure."
   *   *   *   *   *   *   *   *   *   *
   "The Court: I am completely confused now. Didn't you say a while ago, Mr. Rice, that Simmons, I mean Peters was arrested on March 8th as a material witness?
   "A. I believe, your Honor. I am not completely sure.
   "The Court: Am I correct in assuming that he was released on bail of some kind at least, or else he wouldn't have appeared [see infra] later on March 16th?
   "A. Yes, he was."
   No specific findings of facts were made by the suppression court. Under the circumstances, we conclude Peters was arrested as a material witness and released on nominal bail.

a sworn deposition, was obtained from Peters and it recounted the following:

Peters met Motto for the first time at a bar about one week before his body was found. Peters again met Motto at the same bar at about 11:00 p. m. a couple of days prior to his body being discovered. Motto was accompanied by another person and Peters was with a group, including Simmons. Peters and Simmons left first and went to Peters' apartment, arriving at about midnight. At about 1:00 a. m., Motto, accompanied by his friend, arrived at Peters' apartment and was invited in to "drink some beer." Motto's friend was the first to depart and was followed by Motto at about 2:30 a. m. or 3:00 a. m. During the visit a few "small squabbles" occurred. Motto returned about fifteen or twenty minutes later and began to "flash around a gun and a knife." An argument resulted between Motto and Simmons. In Peters' opinion, he, Motto and Simmons were intoxicated but, despite having taken other drugs earlier in the day, they were not under the influence of drugs.

Thereafter, Peters, Simmons, and Motto went to the Cove in Simmons' car. Peters and Simmons told Motto there was a party taking place there. Upon arriving and finding no one else there, the three were "horsing around" until an argument began between Simmons and Motto. Motto then went for a swim. Peters thought Motto was about to drown so Peters swam out to him and pulled him back to the shore. Motto was lying half on the beach and half on the shore when he began referring to Peters and Simmons in vulgar terms. Simmons told Motto to "shut up," but Motto kept "mumbling and talking, and he started hollering." Simmons picked up a rock and hit Motto on the head with it rendering him unconscious. Peters and Simmons remained at the Cove for about a half-hour smoking a few cigarettes. Peters then walked over to look at Motto who was still uncon-

scious but was not bleeding. Peters and Simmons then left Motto and returned to the apartment where most of the other guests had "passed out."

Peters said the only one told of the incident was Sullivan and this occurred about a year prior to giving the C–2 statement. When asked why he was now willing to speak with authorities, Peters responded:

"A.　.　.　.　I am tired of hearing about it.

"Q.　From whom, please?

"A.　Well, just general people talking about it, and my mind didn't rest right, and I don't sleep, and I

just figured it would be a good time to get it out." Peters then stated he would testify against Simmons in court.

Based on this information Simmons was arrested on March 12, 1971 and he gave a statement to the police. After securing Simmons' statement, the police filed a criminal complaint against Peters charging him with Motto's murder; however, Peters was not made aware of the existence of this complaint until he was taken into custody on March 16th.

On March 16, 1971, Peters was requested by Rice to meet him at the State Police Barracks in Trevase and to go from there to the Cove to reenact his version of the incident as given in the C–2 statement. Sullivan, who had been released on bail, accompanied Peters to the barracks on the 16th, although the authorities had not requested Sullivan to do so. Peters, Sullivan, Detective Spewak, and Rice then went by car to the Cove. Upon arriving there at about noon, Spewak advised Peters of his constitutional rights and Peters indicated he wished to waive them. Peters appeared in normal condition on the 16th with the exception of a limp. Rice also testified that he *may* have again mentioned to Peters, while at the Cove on March 16, 1971, that he was a

material witness and would be held as such without bail.[7] Peters then reenacted the events as described in the C–2 statement. [Hereinafter: Reenactment.]

Following the reenactment, Rice asked Peters if he was willing to take a polygraph examination and Peters indicated he was. The four returned to the courthouse for the purpose of administering the examination. Peters, Sullivan, and Spewak went to Rice's office, while Rice went to locate Mr. Hayman, a polygraph examiner. Spewak then came out into the hall and met Rice. Spewak told Rice that Peters had something to tell him. Rice went into the office at about 2:30 p. m. and Peters then stated he had "something he might as well tell now, [which] he had not told [the authorities] before." Rice asked what it was, and Peters said: "While he and Mr.

7. During cross-examination, the following occurred:
"Q. Now, did you again say to him on March 16, 1971, that if he gave you additional information, that he would be held as a material witness at a $1.00 bail?
"A. On March 16th?
"Q. Yes, on March 16th?
"A. No, I believe on the day, I believe he was told that he was going to be held without bail.
"The Court: I am completely confused now. Didn't you say a while ago, Mr. Rice, that Simmons, I mean Peters was arrested on March 8th as a material witness?
"A. I believe, Your Honor. I am not completely sure.
"The Court: Am I correct in assuming that he was released on bail of some kind at least, or else he wouldn't have appeared later on March 16th?
"A. Yes, he was.
"The Court: Now, take it from there . . . ."
Defense Counsel:
"Q. All right. Do you recall having any additional conversation at the cove with Mr. Peters regarding his status as a material witness?
"A. I don't believe so, no.
"Q. You did tell him, did you not, if he refused to take the polygraph—
"A. May I interrupt just a moment. I may have. I may have when he was reconstructing the crime scene . . . down there, I may have mentioned the fact as a material witness, because, as our point of view, that's all he was at this point. We did not arrest—we did not consider him a suspect until he admitted to us in our office he beat this man about the head with his fist."

Simmons and Mr. Motto were at the Cove back in July of 1969, he [Peters] also struck Mr. Motto about the head with his fist." Peters was not rewarned of his rights while at the courthouse. [Hereinafter: C–3.] This statement was not recorded.

Rice contacted Clark and Clark ordered Peters arrested. Peters was then arrested. Rice testified that Peters never became a suspect until March 16, 1971 when he stated he struck Motto.

■ Peters argues C–1 should have been suppressed because he was not advised of his constitutional rights prior to making the statement. In *Commonwealth v. Fisher*, 466 Pa. 216, 352 A.2d 26, 28 (1976), we said:

> "The law is clear that any admissions made by a criminal defendant, which are not preceded by *Miranda* warnings *and which are the product of custodial interrogation,* should be suppressed and precluded from evidentiary use at trial.
>
>     *     *     *     *     *     *     *     *
>
> "In determining if . . . questioning [is] 'custodial interrogation,' the test is not whether there was a prior formal arrest or whether the police detective intended to effect an arrest. '[T]he test for custodial interrogation "does not depend upon the subjective intent of the law enforcement officer-interrogator, but upon whether *the suspect is physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believe[s] that his freedom of action of movement is restricted by such interrogation* . . .."'' *Commonwealth v. O'Shea,* 456 Pa. 288, 292, 318 A.2d 713, 715 (1974), cert. denied, 419 U.S. 1092, 95 S.Ct. 686, 42 L.Ed.2d 685, citing *Commonwealth v. Romberger,* 454 Pa. 279, 283, 312 A.2d 353, 355 (1973), and *Commonwealth v. Marabel,* 445 Pa. 435, 441, 283 A.2d 285 (1971)." [Emphasis deleted. Emphasis added.]

Given the events and circumstances surrounding C–1, there can be no doubt that Peters was not subjected to custodial interrogation. He came voluntarily to the Bristol Police Township Station to be interviewed during the normal course of an investigatory fact-finding process. Although he was requested to do so, he was not "deprived of his freedom of action" nor was he placed in a situation where he could have reasonably believed "his freedom of movement [was] restricted." Furthermore, we are unwilling to adopt a requirement that warnings must be given merely because the police request an interview and it occur at a police station. Accordingly, the admission into evidence of C–1 did not constitute error. See 31 A.L.R.3d 565 § 15.

Peters argues C–2, the testimony recounting the reenactment, and C–3 should have been suppressed because Rice cajoled Peters by telling him "the most that would happen to him would be that he would be picked up or held as a material witness on dollar bail" or "without bail" and thus Peters' waivers of his rights on March 8th and March 16th were ineffective, i. e., not voluntarily given. The suppression court's opinion rejected this argument by stating: "Collateral conversations between [Peters] and the district attorney or police preceding or incidental to C–2 pertaining to the subjects either of [Peters] being held as a material witness and release on nominal bail . . . were not coercive and did not procure or bring about [Peters] giving the statement C–2 involuntarily or against his will." That court ruled the evidence was admissible, but did not specifically address the effectiveness of Peters' waiver of his right to remain silent and other constitutional privileges.

We are not persuaded that C–2, the evidence of the reenactment, and C–3 should have been admitted into evidence, and accordingly, reverse the judgment of sentence and grant a new trial.[8]

8. Because we reverse on this basis it is unnecessary to address Peters' third assignment of error. We have discussed his first as-

Initially, we note that the Commonwealth does not argue *Miranda* warnings were not required before questioning Peters on March 8th and 16th. If they were not required, then the effectiveness of Peters' waivers would be immaterial. But under the circumstances presented, we believe such warnings were required.

Prior to questioning Peters on March 8th, the authorities learned from Sullivan that Peters had information about Motto's death. They also knew that Peters had previously stated in his C–1 statement that he had no such knowledge. Furthermore, Peters was told by Rice that Sullivan had said Peters had information concerning Motto's death. Peters was warned of his rights and then questioned by the district attorney in the presence of a detective and state trooper, and his statement was transcribed by a court stenographer. Similar circumstances existed on March 16th, and most importantly, a criminal complaint against Peters was filed on March 12th.

It is thus apparent to us that, considering all of the circumstances, Peters had become the "focus" of the investigation, *Escobedo v. Illinois*, 378 U.S. 478, 490, 84 S. Ct. 1758, 1765, 12 L.Ed.2d 977 (1964), and he could have reasonably believed his freedom of movement was restricted by the authorities' request for interviews and by the interviews on both March 8th and March 16th. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[9] The authorities knew Peters was one of the last persons to have seen Motto alive, see *Commonwealth v. Romberger*, supra; they knew Peters had more information that he had given them in 1969 *and so in-*

signment of error because, if Peters were successful as to this, a discharge would be necessary. We have discussed the admissibility of C–1 in order to advance the efficient administration of justice. *Commonwealth v. Smith*, 470 Pa. 219, 368 A.2d 272 (1977).

**9.** While Rice's testimony that Peters did not become a suspect until March 16th is relevant, though not determinative, it cannot under the facts presented be given any weight since Rice signed a criminal complaint against Peters on March 12th.

*formed Peters on March 8th;* they did, in fact, warn him of his rights on both occasions; and, they questioned him in a manner " '. . . calculated to, expected to, or likely to, evoke admissions.' " *Commonwealth v. Yount,* 455 Pa. 303, 309, 314 A.2d 242, 245 (1974) quoting *Commonwealth v. Simala,* 434 Pa. 219, 226, 252 A.2d 575, 578 (1969).

Since *Miranda* warnings were required, the statements and the testimony recounting the reenactment should not have been admitted into evidence unless the Commonwealth carried its burden of showing Peters effectively, i. e., knowingly, intelligently, and voluntarily, waived the rights about which he was warned. *Commonwealth v. Goodwin,* 460 Pa. 516, 333 A.2d 892 (1975). We cannot agree that the Commonwealth carried its burden of showing the waivers were voluntarily given on either the 8th or 16th.

It is well-established that a confession induced by a promise of immunity from a person in apparent authority to perform the promise is involuntary. See, e. g., *Commonwealth v. Eiland,* 450 Pa. 566, 301 A.2d 651 (1973). See Wharton, Criminal Evidence (13th ed. 1973). *A fortiori,* a waiver of rights cannot be considered voluntary where it is induced by promises of immunity from such a person. Instantly, Rice, a detective with the District Attorney's office, had such apparent authority. Furthermore, he adopted the remark of defense counsel, that "the most that would happen to" Peters if he provided information "would be that he would be picked up or held as a material witness on dollar bail," as having been made by him on March 8th. The remark promised immunity to Peters by implying he would not be prosecuted. Compare *Commonwealth v. Cornish,* 471 Pa. 256, 370 A.2d 291 (1977). The promise or substance of it was repeated on March 16th. No explanation of this promise was provided by the Commonwealth. Accordingly, we cannot conclude the Common-

wealth carried its burden of showing the waivers on March 8th and 16th were voluntary. See *Commonwealth v. Jones,* 457 Pa. 423, 322 A.2d 119 (1974). As the Supreme Court of the United States stated in *Miranda v. Arizona,* supra 384 U.S. at 476, 86 S.Ct. at 1629 (1966):

". . . any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege."

While it is true that Peters was properly advised of his rights on both occasions, the promise which preceded each set of warnings undoubtedly operated "to undercut the effect of the warning[s] by offering an inducement [for Peters to waive his rights and] to speak." *Commonwealth v. Singleton,* 439 Pa. 185, 191, 266 A.2d 753, 756 (1970). See *Commonwealth v. Jones,* supra. Cf. *Commonwealth v. Nathan,* 445 Pa. 470, 285 A.2d 175 (1971); *Commonwealth v. Romberger,* supra.

Accordingly, the judgment of sentence is reversed and a new trial is granted.

JONES, former Chief Justice did not participate in the consideration or decision of this case.

ROBERTS, J., filed a concurring opinion.

POMEROY, J., filed a concurring opinion.

NIX, J., filed a concurring opinion.

MANDERINO, J., filed a dissenting opinion.

ROBERTS, Justice, concurring.

I agree with the majority that appellant is entitled to a new trial because the Commonwealth failed to meet its burden of proof that appellant knowingly, intelligently and voluntarily waived his *Miranda* rights prior to his second and third statements to the police. Because we reverse, I would not reach the issue whether appellant's first statement should have been suppressed because it

was obtained during a custodial interrogation which was not preceded by *Miranda* warnings.

POMEROY, Justice, concurring.

I agree with the Court that the twice repeated assurances by the police to the defendant that, in effect, he would be immune from prosecution if he cooperated with the authorities served to undermine the validity of Peters' purported waiver of his constitutional rights. In consequence, the Commonwealth has been unable to demonstrate that appellant knowingly, intelligently and voluntarily waived his *Miranda* rights prior to his second and third statements to the police. I also agree with the Court that appellant's failure to raise his double jeopardy claim prior to his second trial precludes consideration of that claim in this appeal. To the extent, however, that today's opinion reaffirms the validity of *Commonwealth v. Bartolomucci*, 468 Pa. 338, 362 A.2d 234 (1976), I disagree, and adhere to my view that *Bartolomucci* was incorrectly decided. *See* 468 Pa. at 353–356, 362 A.2d at 242–44 (Pomeroy, J., dissenting).

NIX, Justice, concurring.

I am in agreement with the majority view that appellant's initial inculpatory statement (C–1) was admissible at trial. At the time this statement was made appellant was not a suspect and was not subjected to custodial interrogation. Under these circumstances it is clear that there was no necessity for *Miranda* warnings to be given. I also believe that C–2, the evidence of the reenactment, and C–3 should have been suppressed because the Commonwealth failed to establish a knowing, intelligent and voluntary waiver of appellant's *Miranda* rights.

With respect to appellant's double jeopardy claim, I agree that the issue has not been properly preserved for appellate review. However, I do not accept the reasoning of the majority insofar as it reaffirms *Commonwealth v. Bartolomucci*, 468 Pa. 338, 362 A.2d 234

(1976). The claim of double jeopardy is a special plea in bar and consequently ". . . must be specially pleaded in the trial court, and may not be raised under a plea of not guilty . . . entered prior to . . . (a) second trial." See *Commonwealth v. Bolden*, 472 Pa. 602, —— n. 5, 373 A.2d 90, 94 n. 5 (filed April 19, 1977) (Dissenting Opinion, Nix, J., joined by O'Brien, J.) citing *Commonwealth ex rel. Wallace v. Burke*, 169 Pa.Super. 633, 636, 84 A.2d 254 (1951). The waiver in this case results from appellant's failure to raise the double jeopardy claim before the commencement of the second action. The reference to and reaffirmance of the majority view in *Commonwealth v. Bartolomucci, supra,* was both unnecessary and unwise. Id. 468 at 349, 362 A.2d at 240. (Dissenting Opinion, Nix, J.)

MANDERINO, Justice, dissenting.

The majority erroneously concludes that appellant has waived his double jeopardy claim. That claim is meritorious and entitles appellant to a discharge. I must therefore respectfully dissent.

As stated in my concurring opinion in *Commonwealth v. Walker*, 468 Pa. 323, 362 A.2d 227 (1976), a double jeopardy claim challenges the court's jurisdiction, and as such, may be raised at any time, even initially on appeal. No court can constitutionally try or sentence a person twice in violation of the double jeopardy provisions of the Federal or state constitutions. Because of these provisions, we concluded in *Commonwealth v. Bartolomucci*, 468 Pa. 338, 362 A.2d 234 (1976), that the failure to specifically object to the correctness of the trial court's *sua sponte* declaration of a mistrial did not constitute a waiver of that issue on appeal.

Additionally, the prosecution in this case has failed to raise the issue of appellant's waiver of this claim, and I believe that this Court violates the command of *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974), by

raising the issue *sua sponte.* I fail to see why the question of whether or not a defendant has preserved an issue for appeal should be treated differently than any other issue. One of the purposes of the *Clair* rule was to encourage attorneys to thoroughly prepare and present their cases at the trial level so that issues could be decided initially there. That need applies with equal force to both defense counsel and prosecutors. If the prosecution fails to raise the issue of the defendant's "waiver" of an issue, it should be held, like any other party on appeal, to have "waived" that issue on appeal, and this Court should not decide that "waiver" issue *sua sponte.* Therefore, I believe that this Court should decide appellant's double jeopardy claim.

Appellant and Simmons were brought to trial on February 6, 1973, charged with murder and other charges, including robbery and larceny counts. Jury selection occupied the entire day of February 6, and was completed by noon February 7, 1973. The taking of testimony began that afternoon and continued through February 8. The prosecution's theory was that appellant and Simmons had taken Motto to the "Cove" for the purpose of taking his money and other valuables. The prosecution however, failed to support this theory, and appellant's demurrer to the robbery, larceny, and associated counts was sustained by the trial court. All evidence had been entered, and the closing arguments of both sides were completed before noon on February 9, 1973. The case was submitted to the jury on counts of murder, assault with intent to commit murder, aggravated assault and battery, simple assault and battery, and related conspiracy counts after instruction by the trial court. These instructions were completed at approximately 2:45 p. m., February 9, 1973. At 4:20 p. m., the jurors were brought back to the court room for further instructions, having requested that the trial court answer certain questions regarding the definition of the crime of mur-

der. Such instructions, occupying ten pages of the transcript, were given. At 6:20 p. m., the court reconvened, without the jury, to announce a recess until 7:45 p. m., and to direct court attendants to provide the jury with an evening meal. The evening meal was given to the jurors in the jury room so that they could continue their deliberations while dining. At 9:15 p. m., the jurors sent another note to the trial court indicating their failure to reach a verdict and adding, "[we] cannot see any chance of coming to a verdict." Upon receiving this note, the trial court had the jury brought into the court room and questioned them, in the presence of counsel and the appellant, as to the possibility of their reaching a verdict upon further deliberation. After pointing out the importance to all concerned of the jurors' using every reasonable effort to reach a decision, while at the same time making clear that it was not intended to coerce any juror into giving up his or her individual beliefs, the trial judge again inquired as to the possible productiveness of further deliberations, and one of the jurors responded affirmatively. Another inquired as to the possibility of rendering a verdict on less than all counts, and the trial judge replied that such could be done but that he hoped that that would not be the result. With this, the jury was sent back for further deliberation.

At 10:30 p. m., the trial judge again reconvened court, and brought the jury back to the court room. The jurors had *not* requested that their deliberations be interrupted, nor had they given any further indication of an inability to reach a verdict. Inquiry by the trial court revealed that in the intervening hour, the jury's deliberations had yielded agreement as to some of the counts. The counts to which the jury had reached agreement were conspiracy to commit murder, assault with intent to commit murder, assault and battery, and conspiracy to commit assault and battery. The counts to which the jury had not reached agreement at this point included the murder

charge, the aggravated assault and battery count, and conspiracy to commit aggravated assault and battery. The trial judge, having thus ascertained the state of the jury's deliberations, turned to counsel and asked if there was "any point in taking the verdict on the ones they have agreed on." The assistant district attorney answered in the affirmative; defense counsel answered in the negative. Without further comment, the trial court declared a mistrial, "by reason of the failure of the jury to be able to agree to a unanimous verdict on all of the charges." The case was continued, a new trial date subsequently fixed, and appellant was released upon existing bail pending a new trial.

Appellant's second trial commenced on April 24, 1973, and was completed on April 26, 1973, upon the rendering of a jury verdict finding appellant guilty of voluntary manslaughter, aggravated assault and battery, assault and battery, conspiracy to commit aggravated assault and battery, and conspiracy to commit assault and battery. Appellant was sentenced to two to five years imprisonment. Post-verdict motions were denied and this appeal followed.

My analysis of appellant's double jeopardy argument begins with an examination of the nature and purpose of the double jeopardy protection provided by the Fifth Amendment to the United States Constitution. As stated in *Commonwealth v. Monte*, 459 Pa. 495, 329 A.2d 836 (1974), the double jeopardy prohibition against retrial represents " 'a constitutional policy of finality for the defendant's benefit' in criminal proceedings. *United States v. Jorn*, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L. Ed.2d 543, 553 (1971)."

"A power in government to subject the individual to repeated prosecutions for the same offense would cut deeply into the framework of procedural protections which the Constitution establishes for the conduct of a criminal trial. And society's awareness of the heavy personal strain which a criminal trial represents for

the individual defendant is manifested in the willingness to limit the Government to a single criminal proceeding to vindicate its very vital interest in enforcement of criminal laws. Both of these considerations are expressed in *Green v. United States,* 355 U.S. 184, 187–188, 78 S.Ct. 221, 223, 2 L.Ed.2d 199, 204–205, 61 A.L.R.2d 1119 (1957), where the Court noted that the policy underlying this provision 'is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' "

As quoted in *Commonwealth v. Monte,* 459 Pa. at 502, 329 A.2d at 839.

On the other hand it has also been recognized that not all retrials should be prohibited, and in certain circumstances the allowance of a second trial is justifiable. In *United States v. Perez,* 9 Wheat. (22 U.S.) 579, 6 L.Ed. 165 (1824), the test for appellate review of a trial judge's exercise of discretion in declaring a mistrial without a defendant's consent was set forth. The standard of *Perez* has been acknowledged as the standard by which we will review such a declaration of mistrial today. That standard requires the ascertainment of whether there was "manifest necessity" for the trial court's declaration. In exercising its discretion in this regard, the trial court, as stated by *Jorn, supra,* must not ". . . forclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." 400 U.S. at 485, 91 S. Ct. at 557, 27 L.Ed.2d at 557. *See also Commonwealth v. Ferguson,* 446 Pa. 24, 285 A.2d 189 (1971).

" '. . . in the final analysis, the judge must always temper the decision whether or not to abort the trial

by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate.' " 446 Pa. at 29, 285 A.2d at 191, quoting from *United States v. Perez,* 9 Wheat. (22 U.S.) 579, 6 L.Ed. 165 (1824).

It has of course been recognized that the genuine inability of the jury to agree upon a verdict constitutes a "manifest necessity" to declare a mistrial over defendant's objection. When such manifest necessity exists, there is no offense to the defendant's Fifth Amendment rights. *Green v. United States,* 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); *Wade v. Hunter,* 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949). See also, the decisions of this Court following the guidelines set forth by the Supreme Court of the United States. E.g., *Commonwealth v. Monte,* 459 Pa. 495, 329 A.2d 836 (1974), and cases cited therein. Additionally, in *Commonwealth v. Brown,* 451 Pa. 395, 301 A.2d 876 (1973), we reiterated our approval of the American Bar Association's Standards Relating to Trial by Jury, Section 5.4(c) which provides:

"the jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement."

It is thus apparent that appellate review of the trial court's exercise of discretion in declaring a mistrial without defendant's approval will necessarily have to examine closely the question of whether a "reasonable, probability of agreement" by the jury existed in a particular case. In so examining the probability of a jury's agreement any doubt as the existence of "manifest necessity" must be resolved

" '. . . in favor of the liberty of the citizen rather than [by exercising] what would be an unlimited, uncertain, and arbitrary judicial discretion.' "

*Commonwealth v. Ferguson,* 446 Pa. at 30, 285 A.2d at 191, quoting from *Downum v. United States,* 372 U.S. 734, 738, 83 S.Ct. 1033, 1035, 10 L.Ed.2d 100, 103 (1963).

Initially, appellant argues that the second trial constituted double jeopardy because there was no "manifest necessity" to declare the mistrial because the jury had deliberated a total time of less than seven and a half hours. In effect, appellant argues that it was unreasonable for the trial court to conclude, on the basis of that limited total time of actual deliberation, that there was no reasonable probability of agreement. The reasonableness of the length of time of jury deliberation is to be determined by a case by case basis. *Commonwealth v. Monte,* 459 Pa. 495, 329 A.2d 836 (1974). As we said in *Monte,*

"There are too many variables in the trial of criminal cases which would prevent the formulation of predetermined periods of time for the jury's deliberation. Each case differs in the *complexity of the issues presented,* the *seriousness of the charges,* the *number of charges* to be considered, the *amount of testimony* to be digested and reviewed, thus requiring the reasonableness of the time for deliberations to be made on a case-by-case basis." (Emphasis added.)
*Id.* at 504, 329 A.2d at 840.

We concluded in *Monte,* based on our analysis of the above variables, that the appellant's second trial did not constitute double jeopardy, because in the circumstances presented in *Monte,* manifest necessity to declare a mistrial existed. These circumstances included the following: only two indictments were submitted to the jury for their determination; and the charges were comparatively minor (consisting of the charge of conspiracy, and of setting up and maintaining an illegal lottery). Additionally, the amount of testimony was not great: the total trial having consumed just over two days time. Because

the issues to be decided were not serious or complex, because the charges were not numerous, and because the amount of testimony to be digested by the jury was small, we concluded that 6½ hours was a reasonable period after which to accept the jury's conclusion that they were hopelessly deadlocked.

In contrast to *Monte, supra,* the issues in the instant appeal were numerous, serious, and complex. As has been previously stated, appellant was charged with several crimes arising out of the death of Vincent Motto. These charges included murder, assault with intent to commit murder, aggravated assault and battery, simple assault and battery, conspiracy to commit murder, conspiracy to commit aggravated assault and battery, and conspiracy to commit simple assault and battery. Furthermore, the murder count included all degrees of murder as well as voluntary manslaughter. Thus, although the instant trial did not consume any more time than did the trial in *Monte,* unlike *Monte,* the issues to be determined here were complex and many, the charges were the most serious that can be brought, and the conclusion that 7½ hours of actual deliberation time was sufficient to indicate that there was no reasonable probability of agreement was, in my opinion, an abuse of discretion under the circumstances.

Furthermore, I note that in the one hour time period between 9:25 p. m., when the jury was sent back for their final deliberations, and 10:30 p. m., at which time the jury was dismissed, the record indicates that the jury had made considerable progress in their efforts to reach agreement on the charges involved here. At 9:15 p. m., the jury had sent a note to the trial judge indicating their failure to reach a verdict and adding "[we] cannot see a chance of coming to a verdict." Upon questioning by the trial court as to the possibility of their reaching a verdict upon further deliberation, the foreman indicated that there was disagreement as to all counts involved.

At 10:30 p. m., the trial judge again called the jury out of the jury room and asked them if there was any possibility that they would be able to agree on all counts. At this time it developed that the jury had agreed as to some of the counts, namely, conspiracy to commit murder, assault with intent to commit murder, assault and battery, and conspiracy to commit assault and battery. The progress which the jury made in that hour further supports my conclusion that the trial court abused its discretion in discharging the jury at that time.

In *Commonwealth v. Ferguson,* 446 Pa. 24, 285 A.2d 189 (1971), we concluded that the trial court abused its discretion by discharging the jury because options other than the grant of a mistrial were available. These options (to proceed on one indictment, then grant a continuance to the prosecution until one of its witnesses could be located and testify as to the other indictment) were available and could have been used rather than the severe measure of declaring a mistrial. In the instant case, I believe that the jury should have been allowed to deliberate longer, and that in light of the progress that it had already made concerning the issues involved, arrangements should have been made to house the jury for the night if that proved necessary. This could have been done without danger of coercing a verdict by forcing the jury to deliberate too long.

The transcript reflects what occurred just prior to the court's declaration of a mistrial.

"(Jury brought in at 10:30 P. M.)

THE COURT: The record will note the defendant and his counsel are present.

Members of the Jury: I have sent for you. I take it from the fact you have not reported that you have no [sic] reached a verdict on all of the counts? Mr. Foreman, am I correct in assuming that is true that you have not yet arrived at a decision on all of the charges?

THE FOREMAN: That is correct, Your Honor.

THE COURT: Have you any reasonable prospect that you will be able to arrive at a decision on all of the counts?

THE FOREMAN: *At this moment,* no, sir, Your Honor.

THE COURT: You had the qualification *at this moment.* I am not sure of the significance of that. Does that indicate you think there might be some usefulness in further deliberation?

THE FOREMAN: *At this moment,* I don't see any chance of reaching a verdict.

THE COURT: All right. Now, may I ask whether you have reached a decision on any of the charges?

THE FOREMAN: Yes, we have, Your Honor."
(Emphasis added.)

The foreman then explained to the trial court those counts which the jury had agreed upon. The following then occurred.

"THE COURT: All right. Implicit that you have not reached a decision on the other charges?

THE FOREMAN: No, sir. *We are close,* but we have not reached a decision. (Emphasis added.)

THE COURT: You keep adding qualifications, Mr. Foreman. I am not understanding the significance of the phrase 'we are close'?

THE FOREMAN: I am sorry. We have not reached a decision on any of the other issues.

THE COURT: Do I take it from the way you phrase it that you think there is a possibility that you might be able to agree?

THE FOREMAN: No, sir.

THE COURT: You used the phrase we are close. That is the reason I questioned that.

THE FOREMAN: Well, I was taking a count, sir, that we had used, and I don't think the count is going to change.

THE COURT: All right. Now, gentlemen, any point in taking the verdict on the ones they have agreed on?

[DEFENSE COUNSEL]: No, Your Honor.

[ASSISTANT DISTRICT ATTORNEY]: Yes, Your Honor.

[DEFENSE COUNSEL]: No, Your Honor.

THE COURT: May I see that indictment, please?

(Court getting indictment from clerk.)

[DEFENSE COUNSEL]: May we approach the bench, Your Honor.

THE COURT: Surely.

(There is a side-bar conference.)

THE COURT: The Court in the exercise of its discretion hereby refuses to receive a verdict on part of these charges.

[ASSISTANT DISTRICT ATTORNEY]: Note my objection.

THE COURT: Overrule the objection of the district attorney. The objection of the district attorney to the failure to receive any verdict at all under the circumstances is overruled. We hereby declare a mistrial by reason of the failure of the jury to be able to agree to a unanimous verdict on all of the charges. It seems to me we have to be, and decide that we might get into an inconsistent position if we took only part of it.

We declare a mistrial, and we hereby continue the case. This jury is discharged from further duty in connection with this case.

---

(Court dismisses jury.)"

The above does not indicate a manifest necessity to declare a mistrial. The colloquy does not establish that

further deliberations would be useless. Just one hour earlier, in terms less equivocal than those quoted immediately above, the jury foreman indicated that further deliberations would be useless, yet, considerable progress had been made in the intervening hour. In these circumstances, the trial court should have allowed the jury to continue its deliberations.

Finally, although the prosecution concedes that appellant neither moved for a mistrial, nor explicitly consented to the mistrial, it argues that appellant impliedly consented to the mistrial by objecting to a recording of the pretrial verdict and by failing to object *after* the mistrial was declared. There is nothing in the record, however, to indicate that appellant's objection to the recording of the partial verdict was a consent to a mistrial rather than an indication of his desire that the jury be allowed to continue its deliberations. Furthermore, failure to object after the mistrial had been declared in the presence of the jury is irrelevant. *Commonwealth v. Bartolomucci*, 468 Pa. 338, 362 A.2d 234 (1976); *Commonwealth v. Baker*, 413 Pa. 105, 115, 196 A.2d 382, 387 (1964).

For these reasons, I would reverse the judgment of sentence and order appellant discharged.