Pamela D. GREEN, Petitioner-Appellee,
Cross-Appellant,

v.

Dorothy J. ARN,
Respondent-Appellant, Cross-Appellee.

Nos. 85-3745, 85-3796.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 26, 1986.

Decided Jan. 27, 1987.

Stuart A. Cole (argued), Asst. Atty. Gen., Columbus, Ohio, for respondent-appellant, cross-appellee.

Paul Mancino, Jr. (argued), Cleveland, Ohio, for petitioner-appellee, cross-appellant.

Before JONES, MILBURN and BOGGS, Circuit Judges.

MILBURN, Circuit Judge.

Dorothy Arn, Superintendent (hereinafter "the State"), appeals the decision of the district court granting petitioner Pamela Green's application for a writ of habeas corpus under 28 U.S.C. § 2254. The district court held that petitioner's convictions on two counts of kidnapping in violation of Ohio Rev.Code § 2905.01 and on three counts of gross sexual imposition in violation of Ohio Rev.Code § 2907.05 were obtained in violation of petitioner's Sixth Amendment right to counsel. 615 F.Supp. 1231 (1985). In anticipation that we might

reverse, petitioner cross-appeals the district court's rejection of her other asserted grounds for habeas relief.

The major issue we are asked to decide is whether harmless error analysis is appropriate where a petitioner demonstrates she was unrepresented by counsel for a critical period of time during the taking of evidence against her at trial. For the reasons set forth below, we answer this question in the negative and affirm the district court.

## I.

The underlying facts, as set forth by the Ohio Court of Appeals, are as follows:

On September 22, 1982, two persons independently responded to the following advertisement in the classified section of the newspaper: "Receptionist, over 18, for body shop, no typing, will train, 721–4418." After doing so, a similar chain of events occurred with both individuals.

Vicki Steadman answered the ad by phone about 10:00 a.m. and spoke with appellant Pamela Green. Pamela drove to Lyndhurst to pick up Vicki to take her to the interview. When they arrived at 9418 Buckeye Road, Pamela introduced Vicki to Jovan, appellant Wendy Rodgers' four-year-old son, and then later told Jovan to stay in his bedroom. Pamela introduced Vicki to appellant Otis Rodgers.

Otis interviewed Vicki, and then Otis, Pamela and Vicki smoked some marijuana. After meeting Wendy Rodgers, Otis began kissing Vicki after Wendy returned to her bedroom, but Vicki pushed him away. He then took Vicki by the hand into Jovan's bedroom and told Jovan to leave. Otis pulled Vicki onto the bed pulled her sweater off, unhooked her bra and fondled her. Vicki was afraid and told Otis she had her menstrual period. Otis then laid her on the bed, put his knee on her arms, and ejaculated on Vicki's bare chest.

For her own safety, Vicki told Otis she would think about the job and let him know the next day whether she wanted it. She tried calling her boyfriend for a ride home, but there was no answer. Otis then drove Vicki home.

Later that day at around 2:00 p.m., Maureen McNea responded to the newspaper ad. She was told that the receptionist job had been filled, but that a babysitting job was available. Pamela drove to Maureen's house in Fairview Park to pick up Maureen to take her to the job interview. When they arrived at 9418 Buckeye Road, Pamela introduced Maureen to Jovan. Later, Maureen met Wendy.

After some brief conversation with Wendy, Maureen met Otis. When Otis left the room, Maureen asked to be taken home. Pamela said they would have to wait for the car which allegedly was being repaired. Maureen tried to phone a friend for a ride home, but the line was busy each time she tried.

While the appellants were in the bathroom engaged in bathtub sex, the phone was ringing. Appellants asked Maureen to answer the phone and record the name and race of the person phoning if in response to the newspaper ad. Maureen took several messages.

When the appellants came out of the bathroom, Maureen again asked to use the phone to try to find a ride home. Otis grabbed the phone, put his leg over it, and started laughing. Pamela said she would take Maureen home after she finished curling Otis's hair, but she did not.

Instead, Otis talked to Maureen about becoming a call girl. Maureen was unresponsive, and Otis became aggravated. Wendy and Otis then took Maureen by her arms and threw her into the bedroom. They said it was time for her initiation. Otis attempted to talk Maureen into having sex with him. He showed her nude photographs, and he pulled her close to him and touched her. Maureen tried to leave the bedroom at that point, but she could not open the bedroom door.

Otis said he was sick of Maureen's excuses. He called Wendy into the bed-

room to show Maureen what would happen to her if she did not acquiesce in his demands. Wendy took a gun out of her purse, told Maureen she would be shot, laughed, and threw the gun to Otis. Otis waved the gun at Maureen and told her there was no way she could get out of having sex with him.

Maureen continued trying to talk her way out. Otis again said he was sick of her excuses. At that point, Pamela and Wendy came into the bedroom, held Maureen down on the bed and began undressing her. Otis undressed and got on top of Maureen at which time Maureen broke away. Otis masturbated and ejaculated on himself. Pamela and Wendy got up and said they had to get to work.

Otis asked Maureen if she wanted to go to Dallas with them the next day at noon. Maureen said they would call her and she would let them know. Otis then drove Pamela and Wendy to work and drove Maureen home.

Appellant Wendy Rodgers testified and denied touching Maureen. She stated she was sleeping since she worked in the evenings and did not feel well. She knew that Otis and Maureen were in the other bedroom with the door closed, but she said she trusted Otis. Wendy and Otis had been married two and one-half years. Wendy also testified that Pamela and Maureen left to buy cigarettes and returned. She denied the alleged bathtub sex and said that Maureen was offered the job. Wendy did not know whether Otis touched Vicki.

On cross-examination Wendy testified that it was important to know the race of the persons calling for the job since she and Otis were an interracial couple which would be offensive to some people. She also testified that no traveling was neces-

sary for the babysitting job, but it was necessary for the receptionist's job.

Joint Appendix at 44–47.

Following petitioner's jury conviction, the trial court pronounced a sentence of seven to twenty-five years imprisonment on each of the kidnapping counts, and two to five years imprisonment on each of the gross sexual imposition counts, all sentences to run consecutively. Petitioner appealed to the Ohio Court of Appeals, which modified her sentence to an aggregate minimum of fifteen years in compliance with Ohio Rev.Code § 2929.41(E)(2). The court affirmed petitioner's conviction and sentence in all other respects. Petitioner's motion for leave to appeal to the Ohio Supreme Court was denied for want of a substantial constitutional question.

## II.

### A. *Sixth Amendment Claim*

Petitioner's Sixth Amendment claim stems from her assertion that her trial counsel was absent from various critical stages of the proceedings. Petitioner was jointly tried along with two other co-defendants who were both represented by Mr. Shaughnessy. Petitioner was represented by retained counsel, Mr. Carlin. In granting the writ, the district court's concern surrounded the absence of Mr. Carlin during the afternoon of the first day of trial, Thursday, June 2, 1983, during which Mr. Shaughnessy cross-examined the state's first witness, victim Maureen McNea. Mr. Carlin was attending a jury sentencing hearing in a capital case in another courtroom on behalf of a different client.[1]

The magistrate, to whom the case was initially referred, applied the two-pronged test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and determined (1) that it is not

---

**1.** Petitioner also asserts that Mr. Carlin was absent during a hearing on a motion to suppress evidence, during the prosecutor's closing arguments to the jury, when the jury asked questions during deliberations, and when various exhibits were offered into evidence during trial. In light

of our holding, *infra,* that Mr. Carlin's absence on the afternoon of June 2, 1983, requires the granting of the writ, we need not discuss these additional claims which raise factual disputes and/or legal issues of waiver.

clear counsel's performance was deficient, and (2) that petitioner failed to show how Mr. Carlin's absence resulted in prejudice.

The district court declined to follow the magistrate's analysis. Relying on *Strickland*, 104 S.Ct. at 2067, and *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984), the district court concluded that prejudice is legally presumed when there has been an actual or constructive denial of the assistance of counsel, as opposed to the ineffective assistance of counsel who is present. The court further reasoned that the absence of counsel during the taking of evidence must be found, as a matter of law, to violate the constitutional right to assistance of counsel.

The State first argues that the district court's characterization of Mr. Carlin's absence on June 2, 1983, is "grossly inaccurate." The district court stated that Mr. Carlin "had not returned after the lunch recess for *any* of the afternoon session." (emphasis supplied). The italicized language is clearly erroneous as the record indicates Mr. Carlin's presence twice during the afternoon session.

However, the state concedes, as it must, that Mr. Carlin was absent for a portion of the afternoon session on June 2, 1983. The record shows the following:

MR SHAUGHNESSY: Your Honor, in this matter, it's now twenty minutes to 4:00. Counsel for Otis and Wendy Rodgers, having conducted a somewhat brief cross-examination from 2:00, in any event, it appears that we were, of course, hoping that Mr. John F. Carlin, attorney for Pam Green, would be back in time to resume his cross-examination.

That not being the case, the record should reflect that he was in a chair case, a murder case, I think we have already mentioned, the State of Ohio vs. David Mapes, before the Honorable James Patrick Kilbane.

That trial concluded with a verdict of guilty on Friday. The sentencing portion, in which the jury is involved, because it is a chair case, was supposed to have taken, supposed to be a week interval everyone thought.

Now, it didn't work out that way. Mr. Carlin then has been called back, and he has had to absent himself from the courtroom. I don't know what he might ask the Court to do.

THE COURT: I can answer that.

MR. SHAUGHNESSY: But I would ask you if you would do this. At least have the young lady [witness McNea] available. Carlin may want to recall her. I don't know.

THE COURT: Let the record reflect the Court, in anticipation of this problem with Mr. Carlin, discussed it with him prior to the lunch break, and he informed me that he would be content with Mr. Shaughnessy's cross-examination on behalf of all three defendants, so with that assurance, the Court feels that one cross-examination is sufficient.

MR. SHAUGHNESSY: Fine, sir.

Joint Appendix at 441–42.

Thereafter, petitioner addressed the trial judge:

MR. SHAUGHNESSY: ... May the defendant Green address the Court very briefly while the jury is coming in?

THE COURT: Certainly.

DEFENDANT GREEN: I would like to find out if we could have this case continued until I have the benefit of my attorney being here in the courtroom with me while this trial is going on?

MR. SHAUGHNESSY: Can he come back?

THE COURT: Why?

MR. SHAUGHNESSY: Do you know where your attorney is, Miss Green?

DEFENDANT: He is in another trial at this time.

MR. SHAUGHNESSY: Why don't you just hold the girl [witness McNea] here until—

THE COURT: We will go until 4:30. When Mr. Carlin come [sic] back, maybe we can go back into that.

*Well, Miss Green, do you feel that by virtue of the fact your attorney, Mr.*

*Carlin, has been in and out the last several days, do you feel that this is not according to the way you want it to go? You prefer to have Mr. Carlin present at all times?*

DEFENDANT GREEN: Yes, I do prefer to have him.

THE COURT: Well, then, I suppose she certainly has the right to counsel, Mr. Carlin. Mr. Prosecutor, do you have any comment?

MR. FALLON: Judge, at this point I don't know what we can do, if she is asking for her attorney to be present, and he is not here, other than that I don't know exactly what's going on up on the twenty-third floor. If maybe we can make a phone call to try to find out what the situation is.

Obviously, my problem is with a witness from out of state. She is here. I have made her available, and I would like to keep her available tomorrow and have her back here.

Joint Appendix at 445–46 (emphasis supplied).

The next morning, the following colloquy occurred:

THE COURT: All right, Mr. Carlin, I understand you want to go on the record.

MR. CARLIN: Yes, Your Honor. I have no questions of the witness, Maureen McNea, and I have been informed by my client, Pamela Green, that she wishes to have me withdraw and find new counsel. I have to inform the Court of that.

THE COURT: All right. Miss Green, the Court will not permit that at this late stage of the trial. This trial must proceed. All right. Call the jury.

Joint Appendix at 447.

Finally, later that afternoon, June 3, 1983, petitioner continued to press the point:

THE COURT: Mr. Carlin, you indicated you wanted to put something on the record. The jury is now out.

MR. CARLIN: May I have a moment, Your Honor? I don't understand this motion that I'm being requested to make on behalf of Pamela Green.

I have been handed a yellow piece of paper saying "Judicial misconduct, defendant's attorney not being present during trial". I would assume that Pamela—

THE COURT: Judicial misconduct?

MR. CARLIN: That's what it says. I'm just reading you what I see.

THE COURT: Continue on.

MR. CARLIN: I assume that because I wasn't present during the entire examination of the first witness, I would assume that that is the reason why she would want a mistrial.

I was under the understanding there was a waiver involved in that, number one, and, number two, Mr. Shaughnessy and I discussed the testimony and the statements made by the first witness and it was our, including Pamela Green, it was our understanding that it would be in the best interests of our case not to ask her any further questions at all, so, therefore, I told Mr. Brian Fallon, even though he had her here for my cross-examination, I told him that I would not be asking her any questions.

That's basically it, Judge. I don't know what else I can say.

THE COURT: The motion for a mistrial is overruled. Further, Miss Pamela Green, your bond is hereby revoked, and you are remanded to the County Facility pending the outcome of this trial.

Joint Appendix at 479–80.

Thus, although Mr. Carlin was present during a portion of the afternoon session of June 2, 1983, it is beyond dispute that he was absent during a critical part of the afternoon. We therefore decline the State's invitation to remand for an evidentiary hearing to determine exactly when Mr. Carlin was absent. Although it may be that some absences by a criminal defendant's attorney might be so de minimis that there would be no constitutional significance, the instant record unequivocally demonstrates that Mr. Carlin's absence was not de minimis. In our view, the

record permits but one conclusion: petitioner's constitutional right to counsel was implicated by Mr. Carlin's absence.[2]

■ We are thus faced with determining the constitutional significance of Mr. Carlin's absence. At the outset, we agree with the district court that the two-pronged *Strickland v. Washington* test is inappropriate where the issue is the denial of the assistance of counsel, rather than a claim that counsel who was present was ineffective. This distinction is referred to in *Strickland v. Washington*, wherein the Supreme Court stated that the "denial of the assistance of counsel altogether is legally presumed to result in prejudice." 104 S.Ct. at 2067. Moreover, in the companion case of *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the Court instructed that there is a "constitutional error without any showing of prejudice when counsel was ... totally absent ... during a critical stage of the proceeding." *Id.*, 104 S.Ct. at 2047 n. 25. *See also Siverson v. O'Leary*, 764 F.2d 1208, 1217 (7th Cir.1985) (a defendant need not affirmatively show prejudice under the second prong of the *Strickland* test in order to establish a Sixth Amendment violation based on the lack of defense counsel's assistance at a critical stage of the criminal proceedings); *Golden v. Newsome*, 755 F.2d 1478, 1481 n. 6, 1483 (11th Cir.1985) (absence of counsel is presumptively prejudicial).

This does not dispose of this case, however, because the State argues that it should be allowed the opportunity to show that the constitutional violation was harmless error. The State relies on *Takacs v. Engle*, 768 F.2d 122, 124 (6th Cir.1985), in which this court relied on *McKeldin v. Rose*, 631 F.2d 458 (6th Cir.1980) (per curiam), *cert. denied*, 450 U.S. 969, 101 S.Ct. 1488, 67 L.Ed.2d 619 (1981), in holding that a harmless error analysis is appropriate in

considering the constitutional effect of the denial of counsel at a preliminary hearing.

However, *Takacs* and *McKeldin* are distinguishable precisely because they dealt with the denial of counsel at preliminary hearings rather than at trial. We noted this distinction in *McKeldin* when we distinguished *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), and *People v. Felder*, 47 N.Y.2d 287, 418 N.Y.S.2d 295, 391 N.E.2d 1274 (1979), in which the courts declined to engage in a harmless error inquiry:

Neither *Holloway* nor *Felder* involved preliminary hearings. Both involved ineffective assistance of counsel at trial. It is established beyond question that denial of effective assistance of counsel at trial may never be treated as harmless error. However, the Supreme Court in *Coleman v. Alabama*, [399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970)], provided specifically for a determination of whether denial of counsel at a preliminary hearing was harmless error.

*McKeldin*, 631 F.2d at 460.

■ In light of *Strickland v. Washington, supra*, we now know the above question is not an entirely accurate statement of the law. An individual claiming ineffective assistance of counsel must show that he was prejudiced by his trial counsel's deficient performance. The instant case, however, poses a different question; *viz.*, is a harmless error analysis appropriate to a claim of the denial of counsel at trial? We believe the answer to this question can be discerned from *United States v. Cronic, supra*:

[B]ecause we presume that the lawyer is competent to provide the guiding hand that the defendant needs, ... the burden rests on the accused to demonstrate a constitutional violation. There are, however, circumstances that are so likely to prejudice the accused that the cost of

---

**2.** The state has not argued that petitioner waived her right to counsel during the June 2, 1983 afternoon session. Indeed, petitioner's actions, set forth above, would not permit a finding that she voluntarily and knowingly waived

her right to counsel. *See Boyd v. Dutton*, 405 U.S. 1, 3, 92 S.Ct. 759, 760, 30 L.Ed.2d 755 (1972) (per curiam); *Martin v. Rose*, 744 F.2d 1245, 1251 (6th Cir.1984).

litigating their effect in a particular case is unjustified.

Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial.[25] Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable. No specific showing of prejudice was required in *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) because the petitioner had been "denied the right of effective cross examination" which "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.'" *Id.,* at 318, 94 S.Ct., at 1111 (citing *Smith v. Illinois,* 390 U.S. 129, 131, 88 S.Ct. 748, 749, 19 L.Ed.2d 956 (1968), and *Brookhart v. Janis,* 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314 (1966)).[26]

[25] The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding....

[26] Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt. See *Strickland v. Washington, post,* 466 U.S., at 687, 104 S.Ct., at 2064....

104 S.Ct. at 2046–47 (citations and footnotes omitted).

Our reading of all these cases leads us to conclude the law is as follows: Where the Sixth Amendment claim is the denial, rather than the ineffective assistance, of counsel, the criminal defendant need only show that counsel was absent during a critical stage of the proceedings in order to establish the constitutional violation. Absence from the proceedings is deficient performance as a matter of law, and prejudice is presumed. Nonetheless, a harmless error analysis is appropriate in some instanc-

es. *See, e.g., Coleman, supra,* 399 U.S. at 10–11, 90 S.Ct. at 2003–04 (preliminary hearing); *Takacs, supra,* 768 F.2d at 124 (preliminary hearing); *McKeldin, supra,* 631 F.2d at 460 (preliminary hearing); and *Siverson, supra,* 764 F.2d at 1217 (jury deliberations and return of the verdict). However, there are some stages of a criminal trial where "the deprivation, by its very nature, cannot be harmless." *Rushen v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 455 n. 2, 78 L.Ed.2d 267 (1983) (per curiam) (citing *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)). *See also Siverson, supra,* 764 F.2d at 1217–18 n. 6 ("We recognize that the lack of counsel at some critical stages may be considered prejudicial *per se,* and may result in automatic reversal of the defendant's convictions without any opportunity for a harmless error inquiry."). "Prejudice in these circumstances is so likely that case by case inquiry into prejudice is not worth the cost." *Strickland v. Washington, supra,* 104 S.Ct. at 2067.

We believe that the present case is one where a harmless error inquiry should be foreclosed. It is difficult to perceive a more critical stage of a trial than the taking of evidence on the defendant's guilt. *Cf. Adams v. Illinois,* 405 U.S. 278, 282–83, 92 S.Ct. 916, 919, 31 L.Ed.2d 202 (1972) (lack of counsel at a preliminary hearing involves less danger to the integrity of the truth-determining process at trial than the omission of counsel at the trial itself). The absence of counsel during the taking of evidence on the defendant's guilt is prejudical per se and justifies an automatic grant of the writ "without any opportunity for a harmless error inquiry." *Siverson, supra,* 764 F.2d at 1217–18 n. 6.

Our holding that petitioner was denied a fair trial is buttressed by the actions of the trial judge. In *Siverson, supra,* the Seventh Circuit noted that in situations where a defendant is without assistance of counsel at a critical stage, "the court can help protect the defendant's rights by at least insuring that the defendant is aware of and understands the right to have counsel

present...." 764 F.2d at 1217. In the instant case, the trial judge seemed to believe that he and Mr. Carlin could decide, without consulting petitioner, when Mr. Carlin could absent himself from the proceedings. Thus, in a situation where the impariment of petitioner's Sixth Amendment right was easy to identify and prevent, the government instead acted to further the deprivation. *See Strickland v. Washington, supra,* 104 S.Ct. at 2067. In such circumstances there is little reason to allow the government to attempt to show a lack of prejudice.

### III.

For the reasons stated, the decision of the district court is AFFIRMED. In light of this holding, we need not address petitioner's cross-appeal.

BOGGS, Circuit Judge, dissenting.

The court's opinion in this case fashions a new rule concerning the presence of criminal defense counsel at trial. "The absence of counsel during the taking of evidence on the defendant's guilt is prejudicial per se and justifies an automatic grant of the writ [of habeas corpus]...." At 1263. Further, this rule will be applied even where counsel is retained, where counsel for co-defendants was conducting a vigorous and wide-ranging cross-examination during the absence, where there is not even the faintest speculation of any actual prejudice that may have occurred, and where every opportunity was given the absent counsel to undertake any further actions he wished when he returned. I do not believe this result is either required by precedent or sensible as policy, and I therefore respectfully dissent.

In simplest terms, what happened here was that retained defense counsel "ducked out" of a joint trial for an undetermined amount of time during the cross-examination of a key witness by counsel for co-defendants. This was concurred in by the other counsel and pursuant to the tactic of having only the other counsel cross-examine this witness.

I agree with the court that it was error for the judge to condone counsel's absence, certainly without the defendant's explicit consent. The issue at hand, though, is whether that error could be harmless, just as errors regarding trial instruction, admission of evidence, argumentation, confrontation, and other critical aspects of trial and other important constitutional rights have been held harmless. It is most remarkable that what happened here is barred from such analysis by the court's *per se* rule, though far less fraught with potential for actual prejudice than in many harmless error cases.

Here, there is no indication that counsel's assistance might have been considered ineffective had he simply sat at counsel table like a bump on a log during the afternoon cross-examination. The cross-examination that was conducted was probing and extensive. It was primarily directed to eliciting information exculpatory to all the defendants, and often dealt with matters that could have been exculpatory to Green. Unless we say that all counsel must "show the flag" on all cross-examinations, a trial tactic that may be highly dubious, counsel's only sin here was absence during some portions of the cross-examination. Taken as a whole, counsel's performance during trial cannot be considered to fall short of the standard in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), nor can it be said that counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." *United States v. Cronic,* 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

The court's *per se* rule, rather, takes its force from dicta in *Cronic,* which notes that some errors concerning sixth amendment rights may never be harmless, such as "complete denial of counsel." 466 U.S. 648, 659, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984). However, the complete denial mentioned there clearly refers to a denial complete in terms of the *process* of truth-seeking. In fact, the quoted language closely follows the observation that the right to counsel

is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the sixth amendment guarantee is generally not implicated.

*Id.* at 658, 104 S.Ct. at 2046.

Obviously, the absence of the particular retained counsel is "complete" every moment it is continued. Given the episodic nature of the absence, and the reason that counsel's active participation was not required, the actions of retained counsel here are not "a complete denial of counsel" in the sense used in *Cronic*. The cases cited in *Cronic*, 466 U.S. at 659, 104 S.Ct. at 2047, and those cited in support of *Cronic* in this opinion, all involve instances where something having to do with the truth-seeking process was prevented by court ruling, or where the part to be played in that process by defense counsel was wholly absent.

Here, there is no hint or even speculation that what went into the record or into the ears of the jury would have differed if the error had not occurred. Nor is this an instance where counsel's presence to object or take a strategic decision could have been crucial, nor where an opportunity was irrevocably waived. It elevates form over substance to equate what occurred here to the true denials of counsel cited in *Cronic*.

It is also quite strange that this *per se* rule is adopted very shortly after the Supreme Court, in *Rose v. Clark*, — U.S. ——, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), and *Delaware v. Van Arsdall*, — U.S. ——, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), reversed the holding of a number of circuits, including ours, that removing from the state the burden of proof on the key element of intent could never be harmless error. In any general weighing of the damage to a defendant or the damage to the truth-seeking process, the events here must rank far lower than the presumption which *Rose* held could be analyzed by traditional harmless error standards.

I reiterate that I do not condone the actions of counsel or court in this case. There are excellent reasons that presence of counsel at all times can be a vital protection for an accused. But so can be all the constitutional rights whose violations are frequently characterized as harmless. The facts of this case are a long way from, for an extreme example, taking of direct testimony against a single defendant whose counsel is absent.

Thus, I find no justification for a blanket rule of this type, and I think the facts of this case show why. If a reversal is mandated whenever counsel (even retained) is absent from the courtroom for any significant period, we make such an escape a sure ticket to a new trial. In multi-defendant cases, judges will be required to keep a continual head count, as in *Stalag 17*, lest cagey counsel be able to invoke this new rule.

This problem will be exacerbated by the difficulty of habeas and appellate courts, reviewing a cold record, in determining the presence or absence of counsel at all times. Again, this difficulty is well-illustrated by this case. On the one hand, some of the factual findings made by the district judge below are simply wrong. As this court notes, counsel was *not* absent for the entire afternoon session. At the same time, his presence is evidenced only by three requests, randomly spaced during the middle of the afternoon, for the witness to speak louder. Both parties had to go outside the record to assert the total length of counsel's absence: five minutes by the government's account, nearly two hours by the defendants'. It stretches the bounds of credulity of this judge to think that this type of issue can be handled appropriately by a blanket rule requiring reversal.

For all of the foregoing reasons, I dissent from the grant of the writ of habeas corpus on the current record.