WILKINS, Circuit Judge,
dissenting in part and concurring in part:
I join the Court’s opinion upholding Bell’s sentence. I part ways with the majority, however, on Wilson’s conviction. In my view, the District Court violated the Fifth and Sixth Amendments by forcing Wilson to continue his defense with replacement counsel who had been absent from court during the earlier testimony of key government witnesses. Because this error requires reversing Wilson’s conviction and remanding his case for a new trial, I respectfully dissent.
I.
The Supreme Court decided United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) and Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) on the same day. In doing so, the Court examined the Sixth Amendment right to the effective assistance of counsel with respect to two very distinct-categories of asserted error. Understanding the reasons for the separate paths is fundamental to the analysis of the error asserted in this case.
In the first category of constitutional error, the defense lawyer “deprive[s] a defendant of the right to effective assistance, simply by failing to render ‘adequate legal assistance.’ ” Strickland, 466 U.S. at 686, 104 S.Ct. 2052 (quoting Cuyler v. Sullivan, 446 U.S. 335, 344, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). “[BJecause we presume that the lawyer is competent to provide the guiding hand that the defendant needs, the burden rests on the accused to demonstrate a constitutional violation.” Cronic, 466 U.S. at 658, 104 S.Ct. 2039 (citation omitted); see also Strickland, 466 U.S. at 688, 104 S.Ct. 2052 (discussing “presumption that counsel will fulfill the role in the adversary process that the Amendment envisions”). To prevail on this type of claim, the defendant must show that counsel’s performance was objectively unreasonable, and that, “but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 U.S. at 687-88, 694, 104 S.Ct. 2052. Thus, the analysis hinges on an examination of “how specific errors of counsel undermined the reliability of the finding of guilt.” Cronic, 466 U.S. at 659 n. 26, 104 S.Ct. 2039 (citing Strickland, 466 U.S. at 693-96, 104 S.Ct. 2052).
The second category of Sixth Amendment error does not examine specific errors of counsel at all. Rather, this error transpires when “[t]here are ... circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.” Id. at 658, 104 S.Ct. 2052. In these instances, the constitutional violation is shown “without inquiry into counsel’s actual performance at trial,” id. at 662, 104 S.Ct. 2052, because “the surrounding circumstances made it so unlikely that any lawyer could provide effective assistance that ineffectiveness [i]s properly presumed without inquiry into actual performance at trial,” id. at 661, 104 S.Ct. 2052 (emphasis added). Stated differently, the circumstances of this type of error are such that “although counsel [was] available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.” Id. at 659-60, 104 S.Ct. 2052.
*108 So how do we identify those circumstances “that are so likely to prejudice the accused” that prejudice is presumed? The Supreme Court provided several salient examples in both Strickland, and Cronic.
In Strickland, the Court observed that prejudice is presumed where there is an “[ajctual or constructive denial of the assistance of counsel altogether.” 466 U.S. at 692, 104 S.Ct. 2052. Cronic agreed, explaining that prejudice is presumed where a defendant was “denied counsel at a critical stage of his trial,” whether actually or constructively. 466 U.S. at 659, 104 S.Ct. 2039. The Court also explained that, when counsel “entirely fails to subject the prosecution’s case to meaningful adversarial testing,” the adversary process is presumptively unreliable. Id.
But in addition to these scenarios, Strickland explained that prejudice is presumed where there have been “various kinds of state interference with counsel’s assistance,” 466 U.S. at 692, 104 S.Ct. 2052, because the “[government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense,” id. at 686, 104 S.Ct. 2052. Again, Cronic agreed, explaining that prejudice is presumed where the defense was “prevented from assisting the accused during a critical stage of the proceeding.” 466 U.S. at 659 n. 25, 104 S.Ct. 2039. In so doing, both Strickland and Cronic reaffirmed the long-established principle that certain impediments to the defense are so grave that they thwart the adversarial factfinding process at the heart of our system of justice. These impediments can result from actions of the trial court as well as those of the prosecutor. When a trial court imposes serious obstacles to a defendant’s ability to obtain the “guiding hand of counsel at every step in the proceedings against him,” due process is denied. Brooks v. Tennessee, 406 U.S. 605, 612, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972) (quoting Powell v. Alabama, 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158 (1932)). This is because “[tjhevery premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.” Herring v. New York, 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975).
In this case, forcing Wilson to finish the trial with a lawyer who had missed several critical days of the proceedings was such an impediment to the defense and interference with counsel’s assistance that prejudice is presumed. To understand why, we need to review the facts.
II.
As the majority explains, Wilson was one of six defendants in a drug conspiracy trial that lasted ten months. Four months into the government’s case, Wilson’s lead counsel, Jenifer Wicks, suddenly took ill, and the District Court initially announced its intent to grant Wilson’s motion for a mistrial. However, the Government objected, and the District Court changed course. The Government proposed that Wilson’s second-chair counsel, Gary Proctor, be elevated to take over his defense, and that the court could take a continuance to allow Proctor to get up to speed. The District Court acceded to this request and denied Wilson’s motion for a mistrial.[1]
*109 Saying that Proctor needed to get up to speed is quite the understatement. Proctor had tried only one other federal criminal case (also as second-chair counsel), had no familiarity with the RICO statute, and had only been admitted to the bar for about five years. Defendant’s June 24, 2007 Trial Brief, United States v. Ball, No. 05-cr-100 (D.D.C. June 24, 2007), ECF No. 1016. He joined Wilson’s defense only a week and a half before trial began, and continued to work on other cases during the first four months of trial. His role on Wilson’s defense was largely administrative; Wicks prepared the trial strategy, interviewed witnesses, and consulted with Wilson while Proctor made photocopies and handled phone calls. Proctor cross-examined only one government witness and met with Wilson independently only once before Wicks took ill. Proctor was thus not merely second-chair counsel; he was a part-time, relatively inexperienced, last-minute addition second-chair counsel.
Because of his administrative duties in this case, as well as his work on his other cases, Proctor was not present in court for about a third of trial before Wicks’s illness. Proctor missed the testimony of several witnesses who were critical to the prosecution’s case against Wilson, including Tor-ran Scott and Renee Cottingham, two of the four witnesses who inculpated Wilson in the murders of Sabrina Bradley and Ronnie Middleton. See Trial Tr. at 11, United States v. Ball, No. 05-cr-100 (D.D.C. June 27, 2007), ECF No. 1040. Proctor was not in the courtroom to watch Scott tell the jury that Wilson had admitted involvement in the shooting, and that Wilson asked Scott to corroborate his alibi. Nor did Proctor see Scott admit on cross examination that he failed to inculpate Wilson until four years after the murders and two days before pleading guilty as part of a deal with the government. Proctor was not present when Cottingham told the jury that Wilson confessed to her that he had committed the murders while she unbraid-ed his hair one evening. Proctor did not see Wicks cross-examine Cottingham on her belief that Wilson was involved in her brother’s homicide, giving her strong incentive to implicate him in Middleton and Bradley’s murders. Scott and Cotting-ham’s testimony, along with the testimony of two co-conspirators who testified in exchange for government leniency, was the only evidence the government presented to connect Wilson with those murders. See Maj. Op. at 102 n. 16.
Proctor missed other significant parts of the prosecution case as well. Proctor was not present during a large part of the cross-examination of Damien Green. Green was a government witness who had testified at length that Wilson had robbed several men at gunpoint, threatened him with a gun, shot at him, and even shot up a recreation center. See Trial Tr. at 11,675-77, United States v. Ball, No. 05-cr-100 (May 17, 2007), ECF No. 942; Trial Tr. at 13,106-12, id. (D.D.C. May 29, 2007), ECF No. 967; Trial Tr. at 13,786-88, 13,827-35, id. (D.D.C. May 31, 2007), ECF No. 978. *110 On cross, when Proctor was absent, other defense attorneys questioned Green about his daily use of drugs and alcohol throughout the period about which he had testified. Trial Tr. at 13,913-22, id. (D.D.C. June 4, 2007), ECF No. 979. Proctor was also absent during — and did not see the jury’s reaction to — a forensic pathologist’s graphic testimony about Middleton and Bradley’s deaths, during which the government introduced into evidence autopsy photographs of their gunshot wounds and their faces. Trial Tr. at 15,629-34, 15,645-69, id. (D.D.C. June 14, 2007), ECF No. 1010,1012.
When Wicks left Wilson’s side, her accumulated knowledge of the case left with her. In particular, Wilson lost: (1) Wicks’s tactical and strategic consultations with Wilson about the trial, (2) Wicks’s appraisal of witness demeanor, and (3) Wicks’s assessment of the jury’s reaction to the witness testimony and physical evidence introduced at trial. In denying Wilson a mistrial and forcing him to continue to verdict with the assistance of a lawyer who had missed so much and who would not have this accumulated knowledge, the District Court deprived Wilson of his right to an attorney with the knowledge necessary to challenge adequately the government’s evidence.
A.
The District Court did not consider the impact on Wilson’s defense of losing Wicks’s work-product from her consultations with Wilson, but Supreme Court precedent makes clear the centrality of these consultations to the right to assistance of counsel. Moreover, when a defendant is denied the opportunity to consult with counsel at trial, prejudice to the defense is presumed. In a series of cases reaffirmed in Cronic, 466 U.S. at 659 n. 25, 104 S.Ct. 2039, the Supreme Court found constitutional error based upon limitations on criminal defendants’ ability to consult with their attorneys. In Geders v. United States, the Court held that a trial court’s denial of the defendant’s access to his attorney during a weekend trial recess violated the right of effective assistance of counsel, because it hampered counsel’s ability to discuss the significance of the day’s evidence with the defendant. 425 U.S. 80, 88-89, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); see also Mudd v. United States, 798 F.2d 1509, 1510 (D.C.Cir.1986) (holding that even an order only barring the defendant from discussing his upcoming testimony with his counsel — but not restricting any other topic of discussion' — ■ during a trial recess violates the Sixth Amendment and requires reversal without a showing of actual prejudice). Similarly, in Brooks, the Court struck down a Tennessee law that required a defendant to take the stand before any other defense witnesses, because it inhibited the “important tactical decision” of whether and when the defendant would testify. 406 U.S. at 612, 92 S.Ct. 1891. In short, “the Sixth Amendment guarantees not just the right to have counsel, but also the right to consult with counsel about important tactical decisions,” to participate in those decisions, and to have one’s counsel “obtain factual information crucial to making them.” United States v. McLaughlin, 164 F.3d 1, 17 (D.C.Cir.1998) (Tatel, J., dissenting).
After Cronic, the Court confirmed that a trial court’s denial of the defendant’s right to confer with his attorney during trial recess “is not subject to the kind of prejudice analysis that is appropriate in determining whether the quality of a lawyer’s performance itself has been constitutionally ineffective.” Perry v. Leeke, 488 U.S. 272, 280, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989). As this Court explained in Mudd, *111 798 F.2d at 1518, a rule that requires the defendant to establish that he was prejudiced by his inability to consult with counsel would require the defendant to show “what he and counsel discussed, what they were prevented from discussing, and how the order altered the preparation of his defense,” and “[presumably the government would then be free to question defendant and counsel about the discussion that did take place, to see if defendant nevertheless received adequate assistance.” Mudd, 798 F.2d at 1513. We stated then that we could not “accept a rule whereby private discussions between counsel and client could be exposed in order to let the government show that the accused’s sixth amendment rights were not violated,” chilling defendants’ ability to communicate freely with their lawyers. Id. (citing Martin v. Lauer, 686 F.2d 24, 32 (D.C.Cir.1982)).
Proctor represented, and the government did not dispute, that while he was out of court attending to his other cases, making copies and performing other administrative tasks (and at one point even travel-ling to Ireland for a family funeral), Wicks was in the courtroom every day discussing the government’s evidence with Wilson and strategizing his defense. The District Court corroborated Wilson’s lack of a relationship with Proctor before Proctor was forced to take over, urging Wilson to “take to heart” the need to communicate with Proctor going forward. Trial Tr. at 16,-639, United States v. Ball (D.D.C. June 27, 2007), ECF No. 1040. Had Wicks remained until the end of trial, her consultations with Wilson undoubtedly would have guided her choices about how to challenge later government witnesses, what further investigation was needed, what witnesses to call in her ease-in-chief, and what to ask those witnesses. Proctor did not observe much of the vital attorney-client consultation that happens during trial while testimony is fresh, and it is completely unrealistic to assume that he could reconstruct those discussions months later based on a cold transcript. Since Wicks was forbidden from any work for the fortnight following her illness, it is beyond dispute that Proctor lacked any access to these consultations in the two weeks he prepared for the close of the government’s evidence. As for the remainder of trial, the record contains no evidence indicating anything other than that most, if not all, of these consultations between Wilson and Wicks were irretrievably lost to Proctor.
In reversing its prior decision to sever Wilson from the trial, the District Court gave no consideration to the prospect that moving forward would mean the loss of months’ worth of Wilson’s consultations with Wicks. See id. at 16,636-39. But the Constitution protects the defendant’s ability to consult with counsel during trial because “ordinarily a defendant is ill-equipped to understand and deal with the trial process without a lawyer’s guidance.” Geders, 425 U.S. at 88, 96 S.Ct. 1330. Criminal defendants know the most about the facts of their own case, but are typically not familiar with the rules of evidence and lack the skill to present their own defense. Powell, 287 U.S. at 68-69, 53 S.Ct. 55. Defense counsel must have access to the information needed to challenge the government’s case. The same constitutional error that flows from a restriction on defendant-counsel communication also results from a court order to continue trial after the knowledge and strategic decisions built upon these communications are lost to the defense. Forcing Wilson to move forward when the substance of his consultations with counsel had been erased fundamentally impaired the adversarial process. Spoliation of the fruits of consultation is no different from denial of consultation in the first place. *112 Based on Geders, Perry v. Leeke, and Mudd, prejudice from such spoliation is presumed.
B.
The loss of Wicks’s appraisal of witness demeanor is a separate highly prejudicial circumstance, because it impaired Wilson’s right to present a defense, including the right to challenge the credibility of government witnesses. See Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). The government conceded at oral argument that witness credibility is a critically important issue to trial success, Oral Arg. Tr. at 21:27-21:38, and that observing live testimony enhances credibility determinations beyond what is possible from merely reading a transcript, id. at 22:04-22:10. We afford trial judges the greatest deference in their role as factfinders precisely because only those who observe witness testimony firsthand “can be aware of the variations in demean- or and tone of voice that bear so heavily on the listener’s understanding of and belief in what is said.” Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (internal citations omitted); see also, e.g., Ornelas v. United States, 517 U.S. 690, 701, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (Scalia, J., dissenting) (probable cause findings are reviewed deferentially because “[a]n appellate court never has the ... full benefit of [the district court’s] hearing of the live testimony.”); Wainwright v. Witt, 469 U.S. 412, 429, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (a trial judge’s “predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record”). It can hardly be gainsaid that “[l]ive testimony enables the finder of fact to see the witness’s physical reactions to questions, to assess the witness’s demean- or, and to hear the tone of the witness’s voice — matters that cannot be gleaned from a written transcript.” United States v. Mejia, 69 F.3d 309, 315 (9th Cir.1995) (internal citations omitted).
Even more importantly, the Sixth Amendment requires that the factfinder observe witness examination first-hand. The Confrontation Clause “commands ... that reliability be assessed in a particular manner: by testing in the crucible of cross-examination,” Crawford v. Washington, 541 U.S. 36, 61, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and entitles a criminal defendant to “both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness,” Barber v. Page, 390 U.S. 719, 725, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). As Judge Learned Hand explained, witness demeanor may prove decisive to the jury’s resolution of a case:
[T]he carriage, behavior, bearing, manner and appearance of a witness — in short, his “demeanor” — is a part of the evidence. The words used are by no means all that we rely on in making up our minds about the truth of a question that arises in our ordinary affairs, and it is abundantly settled that a jury is as-little confined to them as we are. They may, and indeed they should, take into consideration the whole nexus of sense impressions which they get from a witness. This we have again and again declared, and have rested our affirmance of findings of fact of a judge, or of a jury, on the hypothesis that this part of the evidence may have turned the scale. Moreover, such evidence may satisfy the tribunal, not only that the witness’ testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and *113 that, if he is, there is no alternative but to assume the truth of what he denies.
Dyer v. MacDougall, 201 F.2d 265, 268-69 (2d Cir.1952) (footnote omitted).
But unlike other forms of evidence, “[d]emeanor evidence is not captured by the transcript; when the witness steps down, it is gone forever.” United States v. Zeigler, 994 F.2d 845, 849 (D.C.Cir.1993). Just as it is undoubtedly true that, “since [witness demeanor] evidence has disappeared, it will be impossible for an appellate court to say” whether the factfinder was correct in relying on it, Dyer, 201 F.2d at 269, any advocate hoping to challenge witness credibility based on demeanor will be fundamentally handicapped if he did not himself observe the witness testify. Since witness demeanor may determine the jury’s verdict, an attorney must observe the testimony in order to mount an effective defense.
When the District Court forced Proctor to take over Wilson’s defense without having seen key government witness testimony, it denied him the means to prepare his client’s defense. It is folly to expect an attorney who was not present at trial to “pick up the thread of the state’s case, pick up on all the subtle nuances that are apparent only to those actually in the courtroom during trial, read a cold transcript ... and go on to do an effective job on a criminal case.” Minnesota v. Parson, 457 N.W.2d 261, 263 (Minn.Ct.App.1990) (holding that trial court erred in allowing pro se defendant’s standby counsel to leave courtroom during trial after defendant refused his assistance). New lawyers would voluntarily enter into such a disadvantaged position. Indeed, Proctor’s motion for a mistrial explicitly cited his fear of violating his ethical duty to competently represent Wilson. How can we uphold a conviction secured after such a fatal blow to the defense’s ability to challenge the government’s case?
C.
Wilson was further prejudiced because his lawyer missed the reaction of the most important people — the factfinders — to critical portions of the evidence. In Herring, a case favorably cited by both Cronic and Strickland, the Court ruled that the Sixth Amendment was violated because the defendant’s lawyer was not permitted to make a summation in a bench trial. 422 U.S. at 864, 95 S.Ct. 2550. No prejudice needed be shown. And it was immaterial that the trial judge — the factfinder — said that he did not need to hear from the lawyer to decide the credibility issues because “counsel’s argument would not change his mind.” Id. at 860, 95 S.Ct. 2550. The Court described the case as involving the right “to participate fully and fairly in the adversary fact-finding process,” id. at 858, 95 S.Ct. 2550, because “there will be cases where closing argument may correct a premature misjudgment and avoid an otherwise erroneous verdict,” id. at 863, 95 S.Ct. 2550.
Any good trial lawyer knows to watch the jury’s reaction to testimony as it is presented, because jurors’ responses can inform strategic and tactical choices going forward. See Hon. RiohaRd B. Klein, Roberto Aron, Trial Communioation Siulls § 46:4 (2d ed.2014) (“During a court presentation one should observe the jury’s response. ... Not observing the jury’s reaction is like walking down the street with your eyes closed.”); Richard M. Rawdon, Listening: The Art of Advocacy, 36 Trial 99, 101 (2000) (“By noting jurors’ reactions, you can alter -your proof if necessary. ... When you conduct your cross, ... you must observe the jury’s reaction to your questions and the witness’s answers.”); Hon. Stephen S. Trott, Words of *114 Warning for Prosecutors Using Criminals as Witnesses, 47 Hastings L.J. 1381, 1406 (1996). In recognition of the fact that jurors’ reaction to testimony is often key to understanding the ultimate verdict, appellate courts defer to trial judges’ rulings that are informed by observation of those responses. E.g., Palenkas v. Beaumont Hosp., 432 Mich. 527, 443 N.W.2d 354, 356-57 (1989) (determination of whether jury’s verdict was “motivated by such impermissible considerations as passion, bias, or anger” is best left to trial court because it observed jury reaction to witnesses); Pennsylvania v. Fredericks, 235 Pa.Super. 78, 340 A.2d 498, 504 (1975) (upholding declaration of mistrial because trial court was in a “far better position” to weigh whether jury would reach a verdict since it had “observed the jury’s attentiveness and reaction to the evidence”); Redevelopment Auth. of Bucks Cnty. v. Asta, 16 Pa. Cmwlth. 78, 329 A.2d 300, 303 (1974). Perhaps the Eight Circuit summed it up best in explaining why it deferred to a trial judge’s determination that a jury’s damage award was the result of passion or prejudice:
[W]e acknowledge that much of the evidence supporting this inference consisted of the district court’s observations of the jury’s general demeanor, observations that do not necessarily lend themselves to written expression. In other words, perhaps one just had to be there.
Tedder v. Am. Railcar Indus., Inc., 739 F.3d 1104, 1112 (8th Cir.2014).
Wilson was denied an attorney who “had been there” to observe the jury’s reaction to critical testimony that inculpated his client in a double homicide. He was consequently denied a lawyer capable of adjusting his case and focusing his closing argument based on that jury reaction. In this case, the Sixth Amendment mandated that Wilson have an advocate who could effectively present an alternative view of the evidence, and “no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment.” Herring, 422 U.S. at 862, 95 S.Ct. 2550. How could Wilson’s counsel effectively “correct premature misjudgments” that the jurors may have reached about the evidence, when, for much of the case, he was not even present to see their initial judgments?
As explained above, in Cronic and Strickland the Supreme Court identified three scenarios in which prejudice is presumed to result from the denial of the Sixth Amendment right to assistance of counsel. Several of the Supreme Court’s post-Cronic cases have dealt with whether counsel’s performance so “fail[ed] to subject the prosecution’s case to meaningful adversarial testing” that prejudice need not be shown. See Bell v. Cone, 535 U.S. 685, 696-98, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (prejudice not presumed where defense counsel failed to present mitigating evidence and waived closing argument in penalty phase of capital case but delivered opening statement, pointed to mitigating evidence already adduced at trial, and successfully objected to government evidence); Smith v. Robbins, 528 U.S. 259, 286-88, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (prejudice not presumed where failure consisted of attorney’s decision not to file a merits brief on direct appeal). Likewise, the Court has examined what constitutes actual or constructive absence of counsel at a “critical stage,” Cronic, 466 U.S. at 659, 104 S.Ct. 2039, of the proceeding. See Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 169 L.Ed.2d 583 (2008) (counsel’s participation in plea hearing via telephone was not subject to prejudice per se); Roe v. Flores-Ortega, 528 *115 U.S. 470, 484, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (counsel’s failure to timely file appeal worked a complete denial of appellate counsel because it “deprived respondent of the appellate proceeding altogether”); Penson v. Ohio, 488 U.S. 75, 88, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988) (denial of counsel on appeal is subject to presumed prejudice). But the Court has not had occasion to identify further examples of prejudice per se that fall under the final category it identified in Cronic and Strickland: the government or trial court’s interference with counsel’s assistance to his or her client.
Our sister circuits, following the Supreme Court’s lead, have adopted rules that certain other impairments of access to counsel are per se prejudicial. For instance, the Second Circuit concluded that representation by a disbarred attorney is prejudicial per se. United States v. Novak, 903 F.2d 883, 890 (2d Cir.1990). More relevant to the case at bar, a number of our sister circuits have held even brief physical absences of defense counsel from trial presumptively prejudicial. The Sixth Circuit, for instance, overturned a conviction obtained after a trial in which counsel was absent for an afternoon of testimony that directly inculpated the defendant, reasoning that “[i]t is difficult to perceive a more critical stage of a trial than the taking of evidence on the defendant’s guilt.” Green v. Arn, 809 F.2d 1257, 1263 (6th Cir.1987), vacated on other grounds, 484 U.S. 806, 108 S.Ct. 52, 98 L.Ed.2d 17 (1987), reinstated, 839 F.2d 300 (6th Cir.1988). The Fifth Circuit, in United States v. Russell, 205 F.3d 768 (5th Cir.2000), reversed a conspiracy conviction even though the testimony focused on the co-defendants, rather than the defendant, during his counsel’s day-long absence from court.
These cases differ from the instant one only in the physical presence of some lawyer at every stage of Wilson’s trial. But see Burdine v. Johnson, 262 F.3d 336, 341 (5th Cir.2001) (en banc) (overturning murder conviction after counsel, though present, repeatedly dozed during the defendant’s trial). Physical presence is important, since without it there will be no one to object to prosecution evidence and confront the government’s witnesses. But it is not the end of the inquiry. Assessing witness demeanor, consulting with the defendant, and observing the reaction of the jurors are as critical to a criminal defense as cross-examination, and it is those capacities, not the mere risk of “strategic blunders by the defense,” Maj. Op. at 97, that are threatened by the majority’s disposition. It is not enough that some defense lawyer be present to object when necessary; that lawyer must also have the knowledge necessary to carry forward the representation through the defense ease-in-chief and closing argument. Nothing can substitute for observing and listening to live testimony, watching the jurors, and consulting with the defendant in preparing for cross-examination, shaping the evidence the defense will present during its case-in-chief, and structuring closing argument.
Neither the majority nor either party has found a case with facts analogous to this one. The best the majority can muster is United States v. Griffiths, 750 F.3d 237, 239 (2d Cir.2014) (per curiam). But Griffiths is an apple to our orange. First, the case involved a two-week trial on a three count indictment for false statements, obstruction of justice and mail fraud; serious charges no doubt, but far from the bulk, complexity and seriousness of this case. Second, while replacement counsel was brought in to present closing arguments after the defense lawyer suffered a debilitating stroke at the close of *116 the evidence, such counsel had the aid of the defense paralegal who had been present for the entire trial.[2] Finally, and most significantly, the defendant in Griffiths refused to consent to a mistrial, so this was not a case where the alleged trial impairment was due to actions of the government or the trial court, as it is here.[3] In line with Griffiths, courts have declined to reverse midtrial substitutions of counsel only where the circumstances ensured that an incapacitated defense attorney’s knowledge of the case would not be lost to replacement counsel. E.g., United States v. Ortiz-Martinez, 1 F.3d 662, 667 (8th Cir.1993) (attorney who took ill was still present at trial to advise replacement counsel); United States v. Sonnenschein, 565 F.2d 235, 235 (2d Cir.1977) (new counsel had been prepared to try the case from the beginning of trial).
III.
The majority fears that presuming prejudice in Wilson’s case would “sweep virtually every mid-trial substitution under Cronic’s blanket rule,” Maj. Op. at 98, but the Court confuses analysis under Cronic with automatic reversal. Just because all mid-trial substitutions where replacement counsel missed earlier parts of trial should be analyzed under Cronic’s rubric does not mean all substitutions violate the Sixth Amendment. See Perry, 488 U.S. at 279-81, 109 S.Ct. 594 (affirming that “direct governmental interference with the right to counsel” is prejudicial per se, but finding no constitutional error in order prohibiting defendant from conferring with his attorney during a fifteen-minute break in his testimony); Mudd, 798 F.2d at 1514 (“We thus do not find that all orders restricting the discussion of testimony constitute a violation, no matter what their duration; ... [w]hen these sixth amendment violations occur, however, we agree with those circuits that have applied a per se reversal rule.”). The Court need only hold that, when defense counsel is incapacitated mid-trial through no fault of the defendant, and no replacement attorney is available who observed the testimony of key government witnesses against the accused and participated in material consultations with the defendant, the Constitution requires a mistrial.
My colleagues reply that determining situations in which prejudice is presumed with such a degree of specificity would “replae[e] ‘case-by-case litigation over *117 prejudice with case-by-case litigation over prejudice per se.’ ” Maj. Op. at 98 (quoting Scarpa v. Dubois, 38 F.3d 1, 14 (1st Cir.1994)). The First Circuit opinion the majority cites for this proposition arose in a completely different context: it dealt with an ineffective assistance claim based on defense counsel’s trial error, which the defendant argued was so egregious that the court should presume prejudice. The Scarpa court explicitly cautioned that “attorney error, - even when egregious, will almost always require analysis under Strickland’s prejudice prong.” Scarpa, 38 F.3d at 14 (emphasis added). The Supreme Court later made precisely the same point, explaining that, when it comes to defense counsel performance, prejudice will only be presumed if counsel “entirely fail[ed] to subject the prosecution’s case to meaningful adversarial testing,” a distinction that “is not of degree but of kind.” Bell, 535 U.S. at 697, 122 S.Ct. 1843. As I explain above, however, an impediment to the defense affirmatively erected by the government’s objection to a mistrial is wholly different from defense counsel blunder.
In addition, even on its own terms, Scarpa is unconvincing. The First Circuit reasoned that it was inappropriate to presume prejudice when the court must examine the trial record to detect whether the error occurred. Scarpa, 38 F.3d at 14 (“[0]nee it is necessary .to examine the trial record in order to evaluate counsel’s particular errors, resort to a per se presumption is no longer justified by the wish to avoid the cost of case-by-case litigation.”). Yet reviewing the trial record is precisely what must be done even in cases where the application of prejudice per se is unchallenged. See, e.g., Green, 809 F.2d at 1260-61 (analyzing large portions of trial transcript to determine that counsel was absent during government witness testimony that inculpated the defendant). And, contrary to the majority’s exhortation not to frame the circumstances in which the Court should presume prejudice too narrowly, the Supreme Court has admonished us to .define these situations with some specificity. See Woods v. Donald, — U.S. —, 135 S.Ct. 1372, 1377, 191 L.Ed.2d 464 (2015) (framing question as applicability of Cronic rule to counsel’s absence during “testimony regarding code-fendants’ actions”); Wright, 552 U.S. at 125, 128 S.Ct. 743 (“Our precedents do not clearly hold that counsel’s participation by speakerphone should be treated as a ‘complete denial of counsel,’ on par with total absence.”).
Presumptive prejudice as described by Strickland and Cronic is not an historical curio, kept in the reliquary cabinet to be taken out and marveled at but never employed in future cases, no matter how much they fit its pattern. Surely, if there are cases in which prejudice should be presumed, this is one. Wilson was convicted of Middleton and Bradley’s murders solely based on the testimony of witnesses who claimed that he had confessed his involvement to them; no' eyewitnesses testified and no physical evidence connected him to the crime. Replacement counsel missed all of that and more, even venturing to another continent during the trial, and prior counsel was under doctor’s orders not to return to work. Under those circumstances, no “lawyer, even a fully competent one,” Cronic, 466 U.S. at 659-60, 104 S.Ct. 2039, having missed so much of the live testimony and the consultation with the defendant about the proceedings, would be able “to participate fully and fairly in the adversary factfinding process” on the defendant’s behalf. Herring, 422 U.S. at 858, 95 S.Ct. 2550. Wilson had a right to counsel who “had been there” at all critical stages to carry forward this defense at trial, and with Wicks’ incapaci *118 tation, the prosecutors obtained a strategic advantage that resulted in an uneven playing field. Under the teachings of Strickland and Cronic, this was presumptively prejudicial.
Affording Wilson a new trial would undoubtedly have required the investment of additional judicial resources. It is understandable that, four months into trial, the District Court was loath to declare a mistrial, sever Wilson from his codefendants, and schedule a new trial against him at the conclusion of the main event. But that is what the Sixth Amendment and due process required. Because this constitutional violation requires reversal, I would not reach the other crimes evidence and Brady issues.
Accordingly, I dissent.

. The District Court refused to grant a mistrial solely on the ground that appointing Proctor as replacement counsel, appointing a new second-chair counsel, and recessing for sufficient time to allow Wilson's new defense team to prepare would be sufficient to protect Wilson's rights. Trial Tr. at 16,635-37, United States v. Ball (D.D.C. June 27, 2007), ECF No. *109 1040. The District Court’s determination therefore implicitly declined the government’s self-serving invitation to speculate that Wicks would be "available in some capacity” to consult with Proctor. Id. at 16,599. Thus, the majority’s suggestion (based on the biased speculation by the trial prosecutor) that Wicks might have been able to assist Wilson from outside the courtroom after a two-week initial recovery — a proposition for which there is no support — is wholly irrelevant to the decision under review. Of course, it also ignores the fact that the initial two weeks during which Wicks was undisputedly forbidden from discussing work on doctor's orders ended July 9, the day the government resumed its case following a recess. Proctor therefore could not have consulted with Wicks as of the time he had to begin defending the remainder of the government's case.

. As explained above, despite the majority’s speculation that Wicks had “some capacity to accept telephone calls’’ after her hospitalization, Maj. Op. at 93, at the time the District Court denied the mistrial there was no reasonable expectation that she would be able to assist significantly in Wilson’s defense.

. For that reason, any double jeopardy concern is a red herring on our facts. Wilson himself moved for a mistrial, and the “general rule is that the defendant’s motion for, or consent to, a mistrial removes any double jeopardy bar to reprosecution.” Oregon v. Kennedy, 456 U.S. 667, 683, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). See also 2A Charles Alan Wright & Peter J. Henning, Federal Practice and Procedure § 440 (4th ed.2009). But if the circumstance were to arise in the future where a defendant refused to consent to a mistrial after his lawyer’s mid-trial incapacitation, I note that courts regularly conclude that the “lengthy delay” required for replacement counsel to prepare constitutes "manifest necessity” that justifies declaring a mistrial without a double jeopardy bar to retrial, even if the defendant objects to a mistrial. United States v. Williams, 717 F.2d 473, 475 (9th Cir.1983); see also United States v. Tolliver, 937 F.2d 1183, 1188 (7th Cir.1991); United States v. Von Spivey, 895 F.2d 176, 178 (4th Cir.1990); Hudson v. Rushen, 686 F.2d 826, 831 (9th Cir.1982); United States v. Wayman, 510 F.2d 1020, 1028 (5th Cir.1975). I know of no case in which defense counsel's incapacitating illness was not found to constitute manifest necessity.